1

2

3

4                                           **E-FILED on      9/12/05**

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                            SAN JOSE DIVISION

11

12   FIRST NATIONAL MORTGAGE COMPANY,          No. C-03-02013 RMW
     a California corporation,
13                                             ORDER GRANTING IN PART AND
                    Plaintiff,                 DENYING IN PART CROSS-MOTIONS *IN*
14                                             *LIMINE* ON DAMAGES ISSUES
          v.
15                                             **[Re Docket Nos. 192, 198]**
     FEDERAL REALTY INVESTMENT TRUST,
16
                    Defendant.
17

18
          First National Mortgage Company ("First National") and Federal Realty Investment Trust ("FRIT")
19
     have filed cross-motions concerning the measure of damages on First National's first two causes of action.
20
     The court has read the moving and responding papers and considered counsel's arguments.  For the
21
     reasons set forth below, the court determines, assuming that the Final Proposal is a binding agreement, that
22
     the lease's termination date is May 11, 2001; the date of the award will be will be a date calculated by
23
     adding the number of days between the first day of trial and judgment to July 11, 2005; First National may
24
     seek post-award damages only on the portion of the property that was relet; and the measure of damages
25
     for the alleged breach of the put option is the value of the option on May 11, 2001.
26

27

28

ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS *IN LIMINE* ON DAMAGES ISSUES
—C-03-02013 RMW
DOH

# I. BACKGROUND

This dispute centers around a one-acre property containing a class-C office building owned by First National ("the property").  First National and FRIT signed an agreement with respect to the property ("the Final Proposal") on August 25, 2000.  The parties dispute whether the Final Proposal is a binding lease and put option agreement.[1]  The Final Proposal states: "[g]round lease at $100,000 per month.  Lease to include increases of three (3%) annually."  Rice Decl. Ex. A, ¶ 1.  The Final Proposal also provides that "First National is given a 10 year put at a capitalization rate of 9% at the then current annual rental."  *Id*. at ¶ 2.  In addition, the Final Proposal states that FRIT will pay First National $75,000 "to buy out the current lease holder, New Things West."  *Id*. at ¶ 5.  Lastly, the Final Proposal states: "[e]ffective date of agreement as of date of vacating premises."  *Id*. at ¶ 8.

On May 11, 2001 FRIT informed First National that the parties "do not have a binding agreement." Rice Decl. Ex. C.  On May 1, 2003 First National filed its complaint.  First National's first cause of action seeks, *inter alia*, lost rent.  First National's second cause of action seeks damages under the put option. On July 11, 2005 First National wrote to FRIT and stated that it was terminating the lease.  Rice Decl. Ex. D.  On July 18, 2005 First National sold the property to a developer for about $10 million.

# II. ANALYSIS

## A.    First Cause of Action

California Civil Code section 1951.2 establishes the measure of a lessor's damages for a tenant's breach of lease:

> (a) [I]f a lessee of real property breaches the lease and abandons the property before the end of the term or if his right to possession is terminated by the lessor because of a breach of the lease, the lease terminates. Upon such termination, the lessor may recover from the lessee:
> (1) The worth at the time of award of the unpaid rent which had been earned at the time of termination;
> (2) The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the lessee proves could have been reasonably avoided;
> (3) Subject to subdivision (c), the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the lessee proves could be reasonably avoided;

---

[1]     Because this is a motion with respect to damages, and not liability, the court will use the term "lease" instead of "alleged lease."  The court does not mean to imply either that the parties did or did not execute a binding lease agreement.

1    ***
     (c) The lessor may recover damages under paragraph (3) of subdivision (a) only if:
2    ***
     (2) The lessor *relet* the property prior to the time of award and proves that in reletting the
3    property he acted reasonably and in a good-faith effort to mitigate the damages, but the
     recovery of damages under this paragraph is subject to any limitations specified in the
4    lease.

5    Cal. Civ. Code § 1951.2 (emphasis added).[2]  The parties' cross-motions attempt to resolve (1) several key

6    dates necessary to calculate damages under the statute and (2) whether First National may recover post-

7    award damages for lost rent under Cal. Civ. Code § 1951.2(a)(3).

8                    **1.      The Lease's Effective Date**

9              First National requests that the court instruct the jury that "[t]he effective date of the lease is May

10   11, 2001." The Final Proposal states that the lease is effective "as of [the] date of vacating the premises."

11   First National contends that FRIT repudiated the lease on May 11, 2001 by claiming in a letter that the

12   Final Proposal was not binding:

13             As you know, we have had a number of discussions over the last year or so with respect
               to the possible acquisition of the [p]roperty . . . . In fact, as recently as March of this year,
14             we were still trying to establish a structure that satisfied your needs as well as ours.
               Because we have never resolved a number of significant business issues relating to the
15             acquisition of the [p]roperty, we still do not have a binding agreement in place for that
               acquisition.  If and when we enter into a final agreement . . . we can address the
16             [outstanding] issues; however, until that time, we have no obligation to reimburse First
               National for any costs, expenses, lost rent, or other damages incurred by First National
17             with respect to the [p]roperty, all of which are being incurred by you at your own risk.

18   Rice Decl. Ex. C.  First National contends that FRIT's letter absolved First National of any duty to

19   "vacat[e] the premises" because "'one party's repudiation of a duty to render performance discharges the

20   other party's remaining duties to render performance.'" Mot. at 4:5-9 (quoting Rest. (Second) Contracts §

21   253).  FRIT's repudiated and anticipatorily breached the lease, assuming there was one, by unambiguously

22   stating that the Final Proposal is not "binding," and that FRIT is under no current obligation to reimburse

23   First National for "costs, expenses, [or] lost rent." However, although the breach occurred on May 11,

24   2001, it does not necessarily follow that the lease should be deemed to have commenced on that date.  As

25   FRIT points out, the parties agreed that the lease was to commence when First National vacated.  Although

26

27        [2]      A lessor may also recover post-award damages under paragraph (3) if the lease so
     provides.  *See* Cal. Civ. Code § 1951.2(3)(c)(1).  However, the parties agree that the Final Proposal
28   contained no such provision.

ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS *IN LIMINE* ON DAMAGES ISSUES
—C-03-02013 RMW
DOH                                              3

1   FRIT's repudiation discharged any remaining duties on First National to perform, the court is not certain

2   that this repudiation results in moving up the commencement date to a date earlier than that which would

3   have been the commencement date absent the repudiation.  It does, however, seem illogical that the lease

4   would be considered terminated before it began.  Therefore, May 11, 2001 should probably be considered

5   the lease commencement date for calculating damages but the court will consider further argument if the

6   parties disagree on this point.

### 2.      The Lease's Termination Date

8         In its opening brief, First National argues that the lease ended when it wrote to FRIT and formally

9   terminated the lease on July 11, 2005.  FRIT asserts that the lease terminated "in May or June 2001."  In its

10  reply brief, First National switches gears and contends that the lease terminated on May 11, 2001, when

11  FRIT allegedly repudiated the contract.  For the reasons stated above, the court concludes that if the Final

12  Proposal was a binding contract, it was breached and the lease termination date is May 11, 2001.

### 3.      The Time of the Award

14        Because trial was supposed to begin on July 11, 2005—but has been delayed—the parties agree

15  that the date "of the award" will be a date calculated by adding the number of days between the first day of

16  trial and judgment to July 11, 2005.  The court agrees.

### 4.      Post Award Damages

18        First National claims that it is entitled to post-award damages in the form of lost rent under Cal.

19  Civ. Code § 1951.2(a)(3) because (1) it sold the property in July 2005 and (2) it relet a portion of the

20  premises after FRIT's alleged breach.  First National requests that the court instruct the jury that "First

21  National is entitled to post-award damages if, in reletting any portion of the property or in selling the

22  property, First National acted reasonably and in a good faith effort to mitigate its damages."  FRIT objects

23  to the instruction, arguing that the statute strictly conditions such damages on a lessor reletting—and not

24  selling—the entire property.

25        Entitlement to post-award damages is expressly conditioned on the lessor's "reletting" of the

26  property prior to the date of the award.  Cal. Civ. Code § 1951.2(c)(2).  The word "relet" does not mean

27  sell.  Therefore, First National is not entitled to post-award damages based on its alleged mitigation by sale.

28

ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS *IN LIMINE* ON DAMAGES ISSUES
—C-03-02013 RMW
DOH                                                          4

1    First National relies on *Millikan v. American Spectrum Real Estate Services California, Inc.*,

2    where the court stated in *dicta* that "we find nothing in the law, or in reason, that would prohibit a landlord

3    from selling the property to mitigate his loss, provided the trier of fact finds a sale to be a reasonable means

4    to avoid the further loss of rental revenue." 117 Cal. App. 4th 1094, 1100 (2004). However, *Millikan*

5    involved a lease provision that specifically provided for post-award damages. In addition, *Millikan* pointed

6    out that when the lease does not so provide, reletting is required. The court reasoned that "[t]he recovery

7    of lost rental revenue accruing for the balance of the term after the date of judgment under section 1951.2,

8    subdivision (a)(3) is conditioned upon the lease providing this remedy, or, *if the lease does not provide*

9    *this remedy, the property must actually be relet before the time of the award.*" *Id.* at 1101 (emphasis

10   added). Admittedly, a sale would seem to meet the policy reason behind Civil Code § 1951(c)(3), namely

11   the "fear a landlord would win a judgment for damages for the remainder of the lease and then relet the

12   lease to another tenant, in essence receiving a double award." *California Safety Center, Inc. v. Jax Car*

13   *Sales*, 164 Cal. App. 3d 992, 1000 n.8 (1985). However, the court cannot re-write the statute. Further,

14       section 1951.2(a)(3), as originally introduced would have permitted the landlord to recover
         at the time of judgment the amount of damages which would have accrued subsequent to
15       the date of the judgment, less the amount the tenant proves could be reasonably avoided.
         As introduced, the section would have permitted the landlord to be fully compensated at
16       the time of the award, even if there had been no rerenting or accelerated damages clause in
         the lease.

17

18   2 Pacific Law Journal 259, 266-67 (1971) (footnotes omitted). However, for whatever reason, the

19   original version was amended to include the reletting requirement.

20       First National did relet a portion of the property. FRIT maintains that section 1951.2(c)(2)

21   requires that the entire property must be relet to get post-award damages. This is not a sensible

22   interpretation of the statute. The reletting of part of the property could assuage any concern about a double

23   recovery with respect to that portion of the property. If First National can prove that it relet a portion of

24   the property, it can seek post-award damages as to that portion if it can show it acted reasonably and in

25   good faith to mitigate its damages.

26   **B.    Second Cause of Action**

27       The parties stipulate, but the court has not accepted the stipulation, that the measure of damages for

28   FRIT's alleged breach of the put is the difference between the put price and the fair market value of the

property  The parties also agree that, following a repudiation, the non-repudiating party must choose to

proceed in one of two ways:

> [W]hen a promisor repudiates a contract, the injured party faces an election of remedies:
> [1] he can treat the repudiation as an anticipatory breach and immediately seek damages
> for breach of contract, thereby terminating the contractual relationship between the parties,
> or [2] he can treat the repudiation as an empty threat, wait until the time for performance
> arrives and exercise his remedies for actual breach if a breach does in fact occur at such
> time.

*Taylor,* 15 Cal.3d at 137.  Finally, the parties agree that First National elected to proceed under the first

option by filing this lawsuit on May 1, 2003.  The parties disagree, however, on the date on which the court

should measure the fair market value of the property.  First National contends that the jury should

determine when First National would have exercised the put.  FRIT argues that the court must use the fair

market value of the property on the date of FRIT's alleged repudiation.  No case of which this court is

aware has addressed the proper measure of damages following the repudiation of an unexercised option to

sell real property.[3]

     First National relies on *Roehm v. Horst*, 178 U.S. 1 (1900), *Pollack v. Pollack*, 39 S.W.2d 853

(Tex. Ct. App. 1931), *Aetna Life Ins. Co. v. Geher*, 50 F.3d 657 (9th Cir. 1931), *Caminetti v. Pac.

Life Mut. Ins. Co.*, 23 Cal.2d 94 (1943), and *Daum Devel. Corp. v. Yuba Plaza, Inc.*, 11 Cal. App. 3d

65 (1970), for the proposition that courts measure damages in anticipatory repudiation cases "down to the

time of complete performance."  Opp. Mot. at 10:15-16.  The cases demonstrate that courts sometimes

award non-repudiating parties the full benefit of their bargain even if that means speculating to some degree

about future events.  None of these cases, however, involve the repudiation of an option—let alone the

repudiation of an unexercised option.  Instead, in these cases, the date of the future event either (1) can be

easily approximated or (2) would have occurred on a specific date but for the breach.  *See Roehm*, 178

U.S. at 20 (awarding damages for breach of three contracts with fixed future dates of performance based

on repudiation of first contract); *Pollack*, 39 S.W.2d at 857-58 (awarding damages for repudiation of

---

     [3]     In *Schmidt v. Beckelman*, 187 Cal. App. 2d 462 (1960), the court reversed the trial
court's award of damages for beach of an unexercised option to buy real property.  The court reasoned
that plaintiffs had failed to introduce evidence that they had ever exercised the option or were capable of
paying the option price.  *Id.* at 468-70.  The court also determined that the trial court erred by basing
damages on the difference between the option price and the fair market value of the land instead of the
value of the option itself.  *Id.* at 471.

1    contract that was contingent on the plaintiff surviving the defendant based on the parties' respective life

2    expectancies); *Aetna*, 50 F.3d at 559-60 (awarding damages for anticipatory breach of life insurance

3    contract that provided the time and amount of future payments); *Caminetti*, 23 Cal.2d at 99, 106-08

4    (affirming Commissioner of Insurance's use of actuarial tables to award insurance policyholders the

5    difference between the premiums they would have paid and the benefits they would have received over

6    their lives when insurance company became insolvent); *Daum*, 11 Cal. App. 3d at 76-78 (awarding

7    commissions to agent after repudiation when contract specified time and amount of future payments). As

8    such, they cast little light on the issue here, which involves the additional difficulty of determining *when* First

9    National would have exercised the put in the volatile Silicon Valley real estate market.

10       First National also cites *Bertero v. Nat'l Gen. Corp.*, 254 Cal. App. 2d 126 (1967). *Bertero*

11    involved a series of agreements between Bertero and his employer, National. In 1957, National issued a

12    restricted stock option to Bertero with a term of seven years. In 1958, Bertero and National signed a new

13    employment contract that provided him with an additional seven year option to purchase National stock.

14    Both options required Bertero to exercise them within three months after he ceased to be an employee. On

15    March 29, 1962 National repudiated the options and fired Bertero. *Id*. at 131. Bertero sought a

16    declaratory judgment that the options were still valid even though he had not invoked them within three

17    months of National's termination of his employment. The trial court declared that the options were valid

18    and gave National the choice of either (1) extending each of the options so that Bertero had the benefit of a

19    full seven-year term on each or (2) paying damages in the amount of $302,724.17. *Id*. at 133.

20       The court of appeal affirmed, concluding that the trial court had "appropriate[ly] exercise[d] its

21    equitable powers." *Id*. at 140. The court of appeal rejected the argument that Bertero had never exercised

22    his options, reasoning that National's wrongdoing prevented him from doing so, and "'[a] party to a contract

23    cannot take advantage of his own act or omissio[n] to escape liability thereon.'" *Id*. at 146 (quoting *Ray*

24    *Thomas, Inc. v. Cowan*, 99 Cal. App. 140, 145 (1929)). Finally, the court of appeal endorsed the

25    damage award, noting that it "closely approximat[ed]" two methods of valuing the options over their entire

26    seven-year span: one based on the stock warrants' exercise prices in 1965 and one based on the stock's

27    market price in 1964. *Id*. at 149-50.

28

1   Nevertheless, *Bertero* is not a traditional breach of contract case.  The issue before the court of

2   appeal was whether the trial court had exceeded its equitable powers by ordering National to pay

3   damages.  Both the trial and appellate courts found National's apparent bad faith significant, commenting

4   that "defendants wilfully intended" by repudiating the options "to put themselves in an unconscionable

5   position of advantage over [Bertero] so as to compel him to accede to a revision of [his employment]

6   Agreement upon terms satisfactory to defendants."  *Id*. at 142.  Neither court, however, discussed

7   substantive breach of contract damages principles.  *Bertero*'s overriding concern with considerations of

8   "[j]ustice and equity" caution against reading it to mandate the highest possible recovery for repudiation of

9   an option.  *Id*. at 142.  *Bertero*'s holding is also difficult to square with the fundamental precept that

10  contract damages must restore the non-breaching party to the position he would have occupied without the

11  breach.  An option "merely (1) reduce[s] [the] risk of incurring a loss, and (2) increase[s] the likelihood [of]

12  reap[ing] a profit.  However, [an] option neither extinguishe[s] all risk, nor guarantee[s] a profit."  *Scully v.*

13  *US WATS, Inc.*, 238 F.3d 497, 513 (3d Cir. 2001).  Thus, permitting a "plaintiff's after-the-fact assertion

14  that he would have sold stock at a time that, in hindsight, would have been particularly advantageous"

15  would permit the plaintiff to "receive more than the benefit of his bargain."  *Id*.[4]

16  In *Lucente v. IBM Corp.*, 310 F.3d 243 (2d Cir. 2002), the Second Circuit declined to base

17  damages for the anticipatory repudiation of a stock option on the stock's post-lawsuit performance.  In that

18  case, Lucente received restricted stock options from his employer, IBM.  The options expired at various

19  dates between May 1993 and January 2001.  *Id*. at 248.  Lucente eventually took another job.  On April

20  15, 1993 IBM informed Lucente that it had canceled his stock options.  The district court held that IBM's

21  conduct breached its incentive benefits contract with Lucente.  However, the district court permitted

22  Lucente to (1) amend his complaint to assert that IBM repudiated the contract on April 15, 1993, (2)

23  

---

24  [4]    First National tries to avoid this problem by asking the jury to decide when it would have
     exercised the put, citing *Oldenkott v. American Elec., Inc.*, 14 Cal. App. 3d 198 (1971).  In *Oldenkott*,

25  plaintiff's employment contract contained an optional two-year extension.  The court allowed the jury to
     decide whether the plaintiff would have exercised the option.  *Id*. at 203.  However, unlike this case,

26  *Oldenkott* asked the jury to determine *whether* the plaintiff would have exercised his option, not *when* he
     would have done so.  The latter question involves far more uncertainty.  Indeed, First National's principals

27  have been unable to identify the date on which they would have exercised the put in their depositions.
     *See* Dryan Depo., Waranoff Decl. Ex. 2, at 51:4-25; Rubenstein Depo., Waranoff Decl. Ex. 3, at 107:16-

28  115:1.  The court thus believes that the jury cannot resolve the issue without engaging in improper
     speculation.

ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS *IN LIMINE* ON DAMAGES ISSUES
—C-03-02013 RMW
DOH                                            8

1   exercise options that had not yet expired, and (3) recover damages for these options.  The district court

2   then allowed Lucente to choose between recovering the value of his stock options "at the date of IBM's

3   alleged breach (approximately $330,000) or the value of the 2001 options that he attempted to exercise

4   (approximately $4.8 million)."  *Id*. at 261.

5          The Second Circuit reversed.  The court held that Lucente elected to treat IBM's April 15, 1993

6   letter "as a breach, not as a repudiation which he ignored" because (1) he stated so in his complaint, (2) he

7   did not exercise his options before filing his complaint, (3) he sought reconsideration of IBM's decision to

8   revoke his options, and (4) he "fail[ed] to carry out his obligations under the option contract."  *Id*. at 259-

9   60.  Noting that "breach of contract damages are to be measured from the date of the breach," the court

10  rejected the position that the proper measure of damages was "the highest market value of the stock

11  between the time of the breach and a reasonable time thereafter."  *Id*. at 262.  *See also Scully*, 238 F.3d at

12  513 (noting that an award of damages based on a prediction of what a stock's price will be in the future

13  "would be particularly problematic" because of the amount of speculation for which it calls).

14         *Lucente*'s reasoning is sound.[5]  By emphasizing the non-breaching party's election, *Lucente* puts

15  the non-breaching party in a similar position to where he would have been without the repudiation.  As

16  noted, options allow holders to bide their time during the option period.  Likewise, *Lucente*'s approach

17  gives the non-breaching party the freedom to wait until market conditions are particularly advantageous

18  before trying to exercise the option.  The non-breaching party's attempted exercise of the option, in turn,

19  will make the other party's performance due and fix the date for measuring damages.  *See Hermanowski v.*

20  *Acton Corp.*, 729 F.2d 921, 922-23 (2d Cir. 1984) (per curiam) (plaintiff ignored repudiation and

21  received damages determined by the "difference between the market value of the stock and the option

---

[5]      First National contends that *Lucente* is not an "anticipatory repudiation" case, but merely a "breach of contract" case.  The court fails to perceive the difference.  *Lucente* involves a plaintiff who chose to treat a repudiation as an immediate breach of contract.  First National also cites *Sackett v. Spindler*, 248 Cal. App. 2d 220 (1967) for the contention that *Lucente* does not accurately reflect the law in California.  According to First National, *Sackett* held that, in breach of stock option cases, courts must measure damages "'at the time and the place where the goods ought to have been delivered and accepted.'" Rep. Mot. at 9:12-19 (quoting *Sackett*, 248 Cal. App. 2d at 235) (emphasis omitted).  However, *Sackett* also explained that where "no time is fixed for acceptance," then the court must measure damages "at the time of the refusal to [perform]."  *Sackett*, 248 Cal. App. 2d at 235.  Here, and in *Lucente*, there is no fixed time for acceptance.  Thus, measuring damages at the time of the repudiation is not inconsistent with *Sackett*.

1  price" on the date he unsuccessfully tried to invoke option).[6]  This flexibility belies First National's claim

2  that, under FRIT's proposed rule, "the breaching party could unilaterally avoid making the plaintiff whole by

3  repudiating the contract early."  Rep. Mot. at 6:9-11.  To the contrary, the breaching party repudiates the

4  contract at his own peril: the non-breaching party can always insist upon performance at some later, more

5  favorable date.  Alternatively, the non-breaching party can avoid this gamble by suing shortly after the

6  repudiation.

7       As First National admits, it chose the latter path.  As in *Lucente*, where the court determined that

8  Lucente elected to treat IBM's April 15, 1993 letter as an anticipatory breach of contract because he filed

9  suit instead of trying to exercise his options when they vested, here the evidence suggests that First National

10  elected to treat FRIT's May 11, 2001 letter as an anticipatory breach.  Indeed, First National filed suit

11  without vacating the premises or attempting to exercise the put: conduct that would have triggered FRIT's

12  time for performance under the Final Proposal.  Accordingly, the court must evaluate damages as of the

13  date of the repudiation.  *See Freedman v. Rector, Wardens & Vestrymen of St. Mathias Parish*, 37

14  Cal.3d 16, 19 (date of repudiation and date of breach are same if non-breaching party elects to sue before

15  breaching party's performance is due); Samuel Williston, A Treatise on the Law of Contracts § 63:56 (4th

16  ed. 2004) ("the repudiation is itself a breach" when the non-breaching party chooses not to wait until

17  performance is due).  The court thus holds that the correct date by which to measure damages is May 11,

18  2001 and the measure of damages is the fair market value of the property on that date.  The option's value

19  may exceed the difference between the exercise price and the fair market value of the property on that

20  date.  *See Scully*, 238 F.3d at 514 (noting that an option's "intrinsic value . . . does not account for [its]

21  reduced risk of loss and increased likelihood of profit" and thus "generally understates an option's true

22  value"); *Schmidt*, 187 Cal. App. 2d at  471 (opining that damages for breach of an unexercised option

23  should be measured by the "value, not of the land itself, but the conditional right to purchase the land").

---

[6]  First National cites *Daum*, 11 Cal. App. 3d at 76 and the Restatement (First) of Contracts § 338(a) for the proposition that "[t]he immediacy of such right to recover, however, is not determinative of the measure and manner by which such damages are to be computed."  Yet while this may be true for cases where the contract calls for fixed future dates of performance or readily-determinable future payments, *Lucente*, *Scully*, and *Hermanowski* persuasively suggest that it is not so for the anticipatory breach of an unexercised option.

ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS *IN LIMINE* ON DAMAGES ISSUES
—C-03-02013 RMW
DOH

### III.  ORDER

For the foregoing reasons, the court orders, assuming the Final Proposal is a binding agreement, that

     1.    The lease's termination date is May 11, 2001;

     2.    The date of the award will be a date calculated by adding the number of days between the first day of trial and judgment to July 11, 2005;

     3.    First National may seek post-award damages only on the portion of the property that was relet; and

     4.    The measure of damages for the alleged breach of the put option is the value of the option on May 11, 2001.

DATED:      9/12/05                            /s/ Ronald M. Whyte
                                                      RONALD M. WHYTE
                                                      United States District Judge

1    **Notice of this document has been electronically sent to:**

2    **Counsel for Plaintiff(s):**

3    Brian Hennessy          bhennessy@thelenreid.com
     Daven Lowhurst          dglowhurst@thelenreid.com
4    Patrick Ryan            pryan@thelenreid.com
     Paul Rice               price@civlit.com
5
     **Counsel for Defendant(s):**
6
     Nicholas Waranoff       nwaranoff@allenmatkins.com
7    William Huckins         whuckins@allenmatkins.com

8
     Counsel are responsible for distributing copies of this document to co-counsel that have not registered for
9    e-filing under the court's CM/ECF program.

10

11

12   **Dated:**        9/12/05                              DOH
                                                 **Chambers of Judge Whyte**
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS *IN LIMINE* ON DAMAGES ISSUES
—C-03-02013 RMW
DOH                                                12