1

2

3

4                                                      **E-FILED on  8/3/06**

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                     FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                                  SAN JOSE DIVISION

11

12    FIRST NATIONAL MORTGAGE              No. C-03-02013 RMW
      COMPANY, a California corporation,
13                                         **ORDER ON MOTIONS *IN LIMINE*** [1]
                    Plaintiff,
14
           v.
15
      FEDERAL REALTY INVESTMENT TRUST,
16
                    Defendant.
17

18
             **1.      FRIT's Motion for an Order (1) Excluding Evidence and Argument of Implied
19                     Duration of Lease and (2) Excluding Evidence and Argument of a Special
                       Meaning of the Put and Call Provisions to Establish a Duration, or Alternatively
20                     Setting a Preliminary Hearing under Rule 104 to Determine Admissibility of
                       Parol Evidence.  [Docket Nos. 256, 261, 353].** [2]
21
             On August 5, 2003 this court granted FRIT's motion to dismiss First National's breach of
22
      contract claim.  FRIT contended that the Final Proposal was not a binding agreement because it did
23
      not contain an essential element: the lease's duration.  The court noted that it must construe a
24

25          [1]      This Order on Motions *In Limine* was distributed to the parties, without this footnote,
      prior to the commencement of trial but was not filed at the time.  The Order governed the trial
26    proceedings except to the extent the record reflects subsequent modifications.

27          [2]      FRIT contends that this motion "supersedes but is different from" two previously-
      filed motions *in limine*, Docket Nos. 256 and 261.  First National objects to FRIT re-briefing issues.
28    Because these issues are potentially dispositive, the court denies the objection.

1   contract on its face unless the plaintiff specifically alleges that certain terms have a special meaning.

2   Because First National did not do so, the court dismissed its claims, but granted leave to amend:

3           Federal contends that an essential provision – the term or duration of the lease – is
            absent from the Final Proposal.  This argument has merit.  The duration of the lease
4           is not explicitly stated in the Final Proposal.  In its opposition motion National
            argues that the ten year "call" and "put" options confirm that the intended term of the
5           lease was ten years.  Yet, National has not alleged in its complaint that any special
            meaning or effect was attached to the "call" and "put" options.  Absent a special
6           meaning or effect the court must interpret the Final Proposal on its face.  Thus, as
            currently pled, an essential term of the lease is absent and the Final Proposal is not
7           binding.  However, National has demonstrated that it may be able to cure this defect
            by alleging a special effect of the "call" and "put" options, i.e. to reflect a ten year
8           lease term. Therefore, the court grants Federal's motion to dismiss National's first
            claim with leave to amend.

9   August 5 Order at 3:3-12.

10          First National then amended to claim that the put and call provisions had a special meaning

11  that established a lease term of ten years.  On October 24, 2003 the court denied FRIT's motion to

12  dismiss or for summary judgment.  FRIT argued that the statute of frauds barred First National from

13  introducing parol evidence to prove that the put and call options had a special meaning that

14  established a ten year lease term.  The court rejected this contention, reasoning that First National

15  "alleges that the ten-year term is an express term of the Final Proposal, in light of the special

16  meaning both parties gave to [the put and call options]."  October 24 Order at 3:22-23.  The court

17  then held that extrinsic evidence was admissible to prove this meaning.  *Id*. at 4:17-18.

18          On January 25, 2005, the court denied FRIT's motion for summary judgment on First

19  National's breach of contract cause of action and granted First National's motion for leave to file an

20  amended complaint.  Under a heading entitled "[l]ack of an [e]xpress [l]ease [t]erm, the court opined

21  that "Federal correctly points out that the Final Proposal contains no express duration for the

22  ground lease."  January 25 Order at 7:8-9.  Although the court then appeared to re-frame the issue —

23  referring to the possibility of the lease's duration being an "implied term" rather than a special

24  meaning attached to an express term — it nevertheless concluded that a triable factual issue

25  remained on whether the Final Proposal was a valid contract:

26          Although the court raised the issue of whether the meaning of the ten-year "put" and
27          "call" had a "special effect," the more appropriate question is whether a ten-year term
            can be reasonably implied from the nature and circumstances of the contract.  In *Zee*
28          *Medical Distributor Association, Inc. v. Zee Medical, Inc.*, the court recognized that

California law calls for a three step analysis for determining a contract's duration. "The court first seeks an express term. If one is absent, the court determines whether one can be implied from the nature and circumstances of the contract. If neither an express nor an implied term can be found, the court will generally construe the contract as terminable at will." 80 Cal. App. 4th 1, 10 (2000). Federal presents persuasive evidence that the parties did not agree on a ten-year term. However, National asserts that the fact that National was given a ten-year put option, Federal was provided a call at the end of ten years, the economic circumstances at the time of negotiation leading to the Final Proposal, and the negotiations themselves show that the parties intended a ten-year term, and further that such term can be implied from the provisions of the Final Proposal as a whole, as well as the nature and circumstances of the contract. The court finds that National has raised a triable issue of fact as to whether a ten-year duration can be implied.

January 25 Order at 7:16-8:3. First National then filed a second amended complaint but did not allege that the Final Proposal contained an implied duration of ten years.

FRIT argues that the statute of frauds bars First National from contending that the lease's duration is an "implied term."[3] FRIT also notes that First National has never pled such a claim.[4] Alternatively, FRIT contends that the court's previous orders foreclose the "special meaning" theory. According to FRIT, the August 5 Order declared that "[t]he duration of the lease is not explicitly stated in the Final Proposal." August 5 Order at 3:4-5. In addition, FRIT notes that (1) the January 25 Order explained that California follows a three-step process for determining a contract's duration, the first part of which is to "seek[ ] an express term" and the second part of which is to "determine[ ] whether one can be implied" (2) and then proceeded to find that factual issues remained "as to whether a ten-year duration can be implied." January 25 Order at 7:20-8:3. FRIT asserts that because the court skipped to the second step, it must have concluded that there was no express term. In the event that the court holds otherwise, FRIT requests a preliminary hearing under Federal Rule of Evidence 104(a) to consider whether parol evidence is admissible to give the put and call provisions a special meaning. For the reasons stated below, the court denies FRIT's motion.

---

[3] FRIT notes that the court has rejected its statute of frauds challenge to a different issue: whether the lease duration was an express term. *See* October 24 Order at 3:22-23.

[4] FRIT also notes that after the court issued the January 25 Order, only six days remained before discovery closed. FRIT thus seeks the opportunity to conduct discovery on the "implied term" theory should the court permit First National to assert it.

Under the statute of frauds, "[a]n agreement for the leasing for a longer period than one year" must be in writing and signed by the party to be charged.  Cal. Civ. Code § 1624(a)(3).[5]  FRIT argues that the Final Proposal does not constitute a "writing" sufficient to satisfy the statute of frauds.  FRIT cites two secondary sources for the proposition that a lease cannot be such a "writing" unless it clearly sets forth its "essential elements":

> For a writing to satisfy the Statute of Frauds, it must be one that:
> (a) reasonably identifies the subject matter of the contract,
> (b) is sufficient to indicate that a contract with respect thereto has been made between the parties or offered by the signer to the other party, and
> (c) *states with reasonable certainty the essential elements of the unperformed promises in the contract.*
> The authorities generally agree on these three elements. 1 Witkin, *Summary of California Law, Contracts*, § 353, p. 399 (10th ed. 2005).
> ***
> In discussing the requirements to create a lease, the leading treatise on California Real Property law amplifies that the writing must contain all of the essential elements:
> ***
> The memorandum of the agreement to lease *must contain, clearly and unambiguously, all of the essential elements* of the future lease. If it omits essential terms, it is merely an unenforceable agreement to agree. 7 Miller & Starr, *California Real Estate, Landlord and Tenant*, § 19.14, at p. 52 (2001).

Mot. Lim. at 8:22-9:6 (emphasis added).  FRIT contends that *Levin v. Saroff*, 54 Cal. App. 285 (1921) reveals that a lease's duration is an "essential term."  In *Levin*, the California court of appeal remarked that "[t]o create a valid lease, but few points of mutual agreement are necessary: First, there must be a definite agreement as to the extent and boundary of the property leased; second, *a definite and agreed term*; and, third, a definite and agreed price of rental, and the time and manner of payment.  These appear to be the only essentials." *Id*. at 289 (emphasis added).  FRIT then argues that the statute of frauds precludes First National from offering parol evidence to imply a "necessary but omitted term":

> There is, of course, a big difference between resorting to parol evidence to resolve an ambiguity in an agreement, on the one hand, and the implication of a "necessary

---

[5]     Two other statutes of frauds also apply.  *See* Cal. Civ. Code § 1091 ("[a]n estate in real property, other than an estate at will or for a term not exceeding one year, can be transferred only by operation of law, or by an instrument in writing, subscribed by the party disposing of the same"); Cal. Code Civ. P. § 1971 ("[n]o estate or interest in real property, other than for leases for a term not exceeding one year, . . . can be created, granted, assigned, surrendered, or declared, otherwise than by operation of law, or a conveyance or other instrument in writing, subscribed by the party creating, granting, assigning, surrendering, or declaring the same").

missing term," on the other.  In the former situation, the provision is in the agreement; in the latter situation, it is not. [¶].  Thus, since there is no term or duration in the Final Proposal, implication of such a term would not satisfy the Statute of Frauds.

***

The missing essential element of duration cannot be supplied by parol evidence. Although parol evidence can be used to clarify an ambiguity in a term of an agreement, it cannot supply a missing essential term where the Statute of Frauds applies.

Mot. Lim. at 10:16-11:22.

FRIT is correct that this distinction — whether the lease duration in the Final Proposal is "ambiguous" or a whether it is a "necessary missing term" — is key.  If it is the former, First National may introduce parol evidence to show that the put and call provisions give the lease a ten year term.  If it is the latter, the statute of frauds prevents First National from doing so and the Final Proposal cannot be a valid contract.  *Compare Riley v. Bear Creek Planning Committee*, 17 Cal. 3d 500, 509 (1976), *overruled on other grounds in Citizens for Covenant Compliance v. Anderson*, 12 Cal. 4th 345, 366 n.6 (1995) ("Every material term of an agreement within the statute of frauds must be reduced to writing.  No essential element of a writing so required can be supplied by parol evidence.") *with In re Marriage of Benson*, 36 Cal. 4th 1096, 1108 (2005) ("Since the statute of frauds primarily serves to prove that a contract exists, the writing need only mention certain 'essential' or 'meaningful' terms.  Ambiguities can be resolved by extrinsic evidence, which serves as a reliable indicator of the parties' intent in commercial or other arms' length transactions.").

Courts have construed contracts that do not contain important terms as "ambiguous" when the surrounding circumstances obviate the need to spell them out.  For example, in *Hillman v. Koch*, 92 Cal. App. 2d 163 (1949), real estate brokers sold the defendant's property.  The sales contract had a blank space where the amount of the brokers' commission should have appeared.  Above this space someone had written "22,500 net."  *Id*. at 165.  The brokers argued that this meant that the defendant agreed to accept $22,500 for his property and that the brokers could keep any amount in excess.  Even though the contract contained no statement to that effect, the court reasoned the parties must have so intended:

The essentials of a complete agreement were stated: the parties were named, the insertion of the net selling price and the provision that the brokers would pay part of

the expense clearly indicated that a commission would be paid, and the amount of the commission appeared on the face of the instrument.
\*\*\*
The statute [of frauds] requires only that a note or memorandum of the agreement be subscribed by the party to be charged. *While an essential element of the agreement may not be supplied by parol, the usual rules of interpretation are to be applied and the agreement will not be held deficient for the failure to express that which is clearly implied when the writing is interpreted in accordance with the intentions of the parties.*

*Id.* at 168 (emphasis added).

Likewise, in *In re Marriage of McGhee*, 131 Cal. App. 3d 408 (1982), a former husband and wife agreed to divide his military retirement benefits as part of their divorce settlement. The wife remarried. The husband argued that California Civil Code section 4801(b), which requires contracts to continue spousal support after remarriage to be in writing, mandated that the wife's receipt of benefits cease. The court disagreed, noting that the purpose of the agreement was clear:

Statutes which require a writing to make enforceable an agreement between parties, often referred to generically as statutes of frauds, fulfill an important function in sanctifying agreements and facilitating their proof. Nevertheless, such statutes have not been broadly interpreted by California courts because of the inequities which necessarily attend their enforcement. *Although the agreement must be in writing, the writing need only describe the terms of the agreement with "reasonable certainty." Moreover, the agreement will not be held deficient for the failure to express that which is clearly implied when the writing is interpreted in accordance with the intentions of the parties.*
\*\*\*
In the instant case, the purpose of the parties in providing for alternative spousal support payments is evident. Serving as a substitute for unpaid property division payments, Darrell's and Marion's intent that the spousal support continue notwithstanding Marion's remarriage is "clearly implied" in the words of the interlocutory decree. By the very nature of their bargain- an agreed-upon security device to assure continued performance of an order extending until the death of the military retiree -remarriage could not have been intended to terminate that support. *We recognize that explicit exposition of the parties' intent is missing from the interlocutory decree. Under most circumstances, implication of intent would be impossible. But the purpose and structure of this agreement makes it the unusual situation.*

*McGhee*, 131 Cal. App. 3d at 414-15 (emphasis added).

Conversely, courts have struck down contracts for lacking "necessary" terms when nothing in the agreement supports the urged construction. For instance, *Ellis v. Klaff*, 96 Cal. App. 2d 471 (1950) involved a lease that stated that "[t]he lessee agrees to improve said premises by the construction of a building or buildings as soon as building conditions reasonably shall permit." *Id.* at 473. The lessor sought to introduce parol evidence that this clause required the lessee "to

1   construct either a brick or concrete-block building with glass front and service garage, suitable for

2   an automobile salesroom and repair shop, and costing approximately $12,000." *Id*.  The court held

3   that the lessor could not do so, reasoning that the contract did not suggest that the parties had agreed

4   on such minutiae:

>   The construction clause in the lease, as written, however, is too vague and uncertain
>   to give rise to a contractual duty.  Aside from the requirement that the "building or
>   buildings" comply with the city building code, and the implication that it (or they)
>   be sufficiently substantial to be a valuable asset after expiration of the term, the lease
>   is manifestly incomplete in failing to specify whether the lessee was to construct one
>   or more buildings and is wholly silent as to the size, type, materials, location, cost,
>   appearance, or any other details of construction . . . .  *This was an attempt, not to
>   resolve an ambiguity, but to supply essentials of a complete agreement which were
>   lacking in the writing.*

10   *Id*. at 478-80 (emphasis added).

11       Similarly, in *Franklin v. Hansen*, 59 Cal. 2d 570 (1963) the defendant orally agreed to let the

12   plaintiff try to find a buyer for his house.  When the plaintiff succeeded, the defendant sent a

13   telegram "confirm[ing] that I will sell 608 South Bay Front Balboa Island for 100,000 cash this offer

14   good until noon 1-19-60."  *Id*. at 571-72.  The plaintiff claimed that the defendant had agreed to pay

15   him $5000 for his efforts.  Because the telegram said nothing whatsoever about a commission, the

16   court rejected the plaintiff's attempt to introduce parol evidence that he was entitled to one:

>   The telegram in the instant case fails to use any words in recognition of a contractual
>   obligation for a commission . . . .  *There are no ambiguities to be resolved or
>   references to extrinsic materials which would aid in ascertaining a meaning not
>   made definite on the face of the document.*  True, the writer purports to "confirm,"
>   but he also states in definite and certain language that which he confirms.  The
>   meaning of the telegram is clear and definite-it requires no aid in its interpretation,
>   and it does not imply, infer or suggest a commission agreement.  *It is only by resort
>   to extrinsic matters not suggested by the writing that it is possible to determine with
>   any justification that defendant had agreed to compensate plaintiff for his services.
>   This is not sufficient under the established law.*

23   *Id*. at 574-75 (emphasis added).

24       The court holds that the lease duration in the Final Proposal is "ambiguous" and not a

25   "necessary missing term."  Admittedly, unlike *Hillman* and *McGhee*, where common sense

26   illuminated that the parties intended a certain result despite the fact that they did not include express

27   contractual language to that effect, it is less clear that First National and FRIT agreed on a ten year

28   term.  Nevertheless, the Final Proposal provides some support for this position.  The fact that it

contains both a ten year put and a ten year call raises a triable issue as to whether the parties

1    intended that, one way or another, FRIT would purchase the property — thus terminating the lease

2    — within ten years.  As the California Supreme Court has opined, a contract is binding if it

3    "demonstrate[s] the existence of a contractual intent on the part of the one to be charged, and

4    extrinsic evidence [i]s necessary only *to define the limits thereof*."  *Franklin*, 59 Cal. 2d at 573

5    (emphasis added).  Because the Final Proposal expressly includes every essential element of a valid

6    agreement except the lease's duration, it arguably manifests the parties' desire to be bound; extrinsic

7    evidence then "define[s]" the temporal "limits" of this agreement.  Unlike the lessor in *Ellis*, who

8    tried to show that the parties understood the words "building or buildings" to have an extraordinarily

9    specific meaning, or the broker in *Franklin*, who argued that a one-sentence authorization to sell

10   implicitly granted him a $5000 commission, First National's interpretation of the Final Proposal has

11   a foothold in the contract's text.  As FRIT's own authority states, a writing can satisfy the statute of

12   frauds even if it only describes the essential elements with "reasonable certainty."  Witkin, *Summary*

13   *of California Law, Contracts*, § 353, p. 399.  Although Miller & Star describes a higher standard, it

14   cites inapposite cases for support.  *Compare* Miller & Starr, *California Real Estate, Landlord and*

15   *Tenant*, § 19.14, at p. 51 (citing *Birdsong v. Welch*, 181 Cal. App. 2d 749 (1960), *Store Properties v.*

16   *Neal*, 72 Cal. App. 2d 112 (1945), and *Levin*, 54 Cal. App. at 291 for the proposition that "the

17   agreement to lease must contain, clearly and unambiguously, all of the essential elements") *with*

18   *Birdsong*, 181 Cal. App. 2d at 751 (agreement not binding when it stated that "the parties . . . will

19   forthwith proceed to arrive at a definite understanding on the points which are left open"); *Store*

20   *Properties*, 72 Cal. App. 2d at 117 (agreement not binding when it stated that "if a lease upon the

21   above terms and conditions has not been executed within 30 days from date hereof, both parties

22   reserve the right at anytime thereafter, but prior to the execution of such a lease, to terminate this

23   offer"); *Levin*, 54 Cal. App. at 291 (holding that lease was binding despite the fact that it "does not

24

25

26

27

28

1   specify the city and state in which the property is located").[6]  In fact, no case of which this court is

2   aware has ever invalidated a lease for failing to contain a duration.[7]

3         Moreover, FRIT's challenge to the January 25 Order and the notion that the Final Proposal

4   contains an "implied" duration rests on a rigid interpretation of the statute of frauds — an approach

5   that is falling from favor.  *See* 4 Corbin on Contracts (Rev. ed. 1997) § 22.2, p. 709 ("[t]he latter half

6   of this century has seen a discernable trend toward a less mechanical application of the statute of

7   frauds, favoring the admission of extrinsic evidence wherever its exclusion is not necessary to

8   preserve the statute's essential purposes"); 10 Williston on Contracts (4th ed.1999) § 29:4, p. 438 ("if

9   after a consideration of the surrounding circumstances, the pertinent facts and all the evidence in a

10  particular case, the court concludes that enforcement of the agreement will not subject the defendant

11  to fraudulent claims, the purpose of the Statute will best be served by holding the note or

12  memorandum sufficient even though it is ambiguous or incomplete").  A recent California case is

13  instructive.  In *House of Prayer v. Evangelic Assoc. for India*, 113 Cal. App. 4th 48 (2003), the court

14  held that the statute of frauds did not invalidate a contract for the sale of real property even though it

15  did not contain an "essential element": the time of payment.  Like FRIT, which cites several cases

16  that suggest— but do not hold— that a lease duration is an "essential element," the defendant in

17  *House of Prayer* cited numerous cases that declared— but did not hold— that "the time of payment

18  is an essential term of a contract for the sale of real property."  *Id*. at 53 (citing *O'Donnell v. Latter*,

19  68 Cal. App. 2d 376, 381 (1945); *Far v. Wells*, 156 Cal. App. 2d 322, 327-28 (1957); *King v.

20  Stanley*, 32 Cal.2d 584, 589 (1948); *Roller v. California Pacific Title Ins. Co.*, 92 Cal. App. 2d 149,

21  156 (1949)).  Just like this court's January 25 Order, which relied on *Zee* and the general principle

22  that courts may imply a duration into a contract, *House of Prayer* applied the basic tenet that courts

23  can imply a time for performance even when none appears:

24          [We hold that the time of performance of an act required for the sale of property
             subject to the statute of frauds may be implied.

25          ***

---

26

27      [6]    In addition, the Restatement (Second) of Contracts section 131 shares Witkin's view
    that the essential terms need only be "reasonabl[y] certain."

28      [7]   *Cf. Losson v. Blodgett*, 1 Cal. App. 2d 13, 16 (1934) (holding that agreement was
    sales contract, not lease, because, *inter alia*, "no term whatever is mentioned in the instrument").

It is often stated . . . that the time of payment is an essential term of a contract for the sale of real property. However, in none of these cases was the absence of a term specifying the time of performance an issue. Accordingly, the statements are *dicta*, and secondary sources relying on such cases are not controlling here. Accordingly, the trial court did not err in concluding time of performance was not an essential term of this agreement based on the agreement and its context. We imply a reasonable time for performance of the agreement, and with the implied term, the agreement is enforceable.

*Id.* at 50, 54-54. Thus, like *House of Prayer*, this court rejects a formalistic interpretation of the statute of frauds. Whether conceptualized as express terms that carry a special meaning or an implied term of duration, First National is entitled to argue to the jury that the put and call provisions establish a ten year lease.[8] *See Birdsong*, 181 Cal. App. 2d at 752 ("The principal question to be determined is whether or not the agreement . . . was a binding agreement or whether or not the parties intended to be bound only when a formal lease was executed. *This is essentially a question of fact*.") (emphasis added). Although this meaning is "implied" in the sense that it imbues words with a significance that they do not have on their face, it is not "implied" in the manner that the statute of frauds prohibits: the wholesale importation of rights and duties without an adequate link to contractual language.

The court also denies FRIT's request for a Rule 104 preliminary hearing.[9] FRIT contends that the court should consider parol evidence to determine whether the Final Proposal is reasonably susceptible to First National's proffered construction. A court must provisionally receive extrinsic evidence that can prove a meaning to which the language of the contract is "reasonably susceptible." *Pacific Gas & Elec. Co. v. Thomas Drag*, 69 Cal. 2d 33, 39-40 (1968). If the court finds after considering this preliminary evidence that the language of the contract is not susceptible to two plausible readings, "extrinsic evidence cannot be received for the purpose of varying the terms of the contract. *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 872 (9th Cir. 1979).

---

[8]   Because the court does not believe that there is a significant distinction between a "special meaning" or "implied duration" approach under the circumstances of this case, the court is not persuaded that FRIT is entitled to discovery on the latter theory or that First National's failure to plead it has prejudiced FRIT.

[9]   At oral argument, FRIT contended that such a hearing would be helpful because First National's only evidence that the put and call provisions establish the lease term is its principals' statements that this "was understood." However, as discussed below, First National's evidence that the economic realities of the situation made it clear that one party would exercise the lease within ten years also supports its interpretation.

1    However, "[where the interpretation of contractual language turns on a question of the credibility of

2    conflicting extrinsic evidence, interpretation of the language is not solely a judicial function.  As

3    trier of fact, it is the jury's responsibility to resolve any conflict in the extrinsic evidence properly

4    admitted to interpret the language of a contract." *More v. Vanuatu*, 64 Cal. App. 4th 904, 912

5    (1998).  Here, the January 25 Order determined that First "National has raised a triable issue of fact

6    as to whether a ten-year duration can be implied."  January 25 Order at 8:2-3.  Although FRIT

7    asserts that this finding pertained only to the lease's "implied duration," as discussed above, there is

8    no meaningful distinction between that theory and a "special meaning" theory.  In addition, First

9    National has offered evidence that the parties intended the lease to last no longer than ten years

10   because FRIT intended to demolish the existing building and construct a parking garage.  *See, e.g.,*

11   Dryan Depo. at 43:12-22 ("Everyone knew it was for 10 years, because we were going to have —

12   everyone knew the building was going to be demolished.  So what would we have ended up with

13   after 10 years, essentially we would have had . . . half a parking lot on it.").  Although FRIT has

14   ample evidence to the contrary, First National's showing is strong enough to make the contract

15   reasonably susceptible to the view that the lease has a ten year duration.

16        FRIT's authority in support of its contention that the Final Proposal is unambiguous is

17   distinguishable.  In each of FRIT's cited cases, courts either (1) rejected attempts to introduce parol

18   evidence in support of a interpretation that contradicted the agreement, *see Bionghi v. Metropolitan*

19   *Water Dist. of So. Cal.*, 70 Cal. App. 4th 1358, 1363-64 (1999) (extrinsic evidence not admissible to

20   prove that contract that "may be terminated . . . 30 days after notice in writing" required good cause

21   for termination); *Winet v. Price*, 4 Cal. App. 4th 1159, 1167 (1992) (extrinsic evidence not

22   admissible to prove that release of "any and all" claims "whether known or unknown" only applied

23   to some claims); *A. Kemp Fisheries v. Castle & Cook, Inc.*, 852 F.2d 493, 496-97 (9th Cir. 1988)

24   (extrinsic evidence not admissible to prove that charter agreement that disclaimed "warranties,

25   express or implied, with respect to the [v]essel" constituted a "warrant[y] [of] the seaworthiness of

26   the vessel, the condition of the engines, and the capacity of the freezing system") or (2) involved

27   extenuating circumstances not present here, s*ee Tahoe Nat'l Bank v. Phillips*, 4 Cal.3d 11, 16-17

28   (1971) (extrinsic evidence proffered by bank not admissible to prove that contract entitled

1  "Assignment of Rents and Agreement Not to Sell or Encumber Real Property" was a mortgage

2  because (1) "[i]ts title gives no hint of foreclosure" and (2) the bank created the agreement using a

3  "carefully drafted" form ).  Here, nothing in the Final Proposal directly contradicts First National's

4  proffered reading.  The court thus denies FRIT's motion.

5      **2.**    **FRIT's Motion to Bar Argument that It Committed Fraud [Docket No. 357]**.

6      FRIT seeks to preclude First National from adding a cause of action for promissory fraud.

7  FRIT notes that the court has previously dismissed First National's fraud claims and that FRIT's two

8  chief witnesses on this claim, Guttman and Hannigan, are no longer with the company and will not

9  testify live at trial.  In response, First National argues that its promissory fraud claim is different

10  from its previously-dismissed claims.  First National explains that, depending on the evidence

11  adduced at trial, it may seek leave to amend its complaint to allege that FRIT entered into the Final

12  Proposal knowing that it was a binding contract but with the intent to disavow it if the real estate

13  market took an unfavorable turn.  First National also contends that FRIT's motion is premature

14  because First National has not yet sought leave to amend.  The court denies the motion as premature

15  and questions whether First National will be able to prove up any promissory fraud claim that would

16  justify an amendment alleging promissory fraud.

17      **3.**    **First National's Motion to Exclude Legal Conclusions of Richard Burt [Docket No. 373].**

18

19      The parties signed the Final Proposal on August 25, 2000.  Paragraph 7 states that FRIT will

20  "prepare a legal agreement for First National's review to finalize the agreement."  Burt was First

21  National's lawyer.  On November 15, 2000 Steven Casad, FRIT's attorney, sent Burt a followup

22  agreement.  On December 8, 2000 Burt wrote back, stating (1) "Because the draft documents

23  represent a significantly different deal than the one contemplated, my comments are limited to

24  important business issues," (2) FRIT "should investigate the property fully, and if it decides to go

25  forward with the ground lease, it should do so on the basis that it assumes all responsibility for the

26  property during the term of the ground lease," (3) "The existing landowner, D & R Partnership, will

27  be converted to a California LLC before entering into any contractual relationship with [FRIT]," and

28  (4) "The term of the ground lease, an essential element, was never addressed in the letter of intent.

The landlord proposes a 50-year term."  During his January 27, 2004 deposition, FRIT asked Burt

about these statements and whether he considered the Final Proposal to be binding. First National moves to exclude evidence and argument "regarding the legal conclusions" Burt stated in the letter and his deposition.

The court denies the motion. None of the statements involve legal conclusions. First National argues that "California courts repeatedly have emphasized that the 'objective manifestations' of intent at the time of execution are determinative to the issue of contract formation rather than a party's secret, and potentially contrary, subjective intent." Mot. Lim. at 2:15-18. It is true that "the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language." *Winet*, 4 Cal. App. 4th at 1166 n.3. Nevertheless, Burt's views are not "undisclosed": he expressed them in a letter. Moreover, "[t]he practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party[.]" *So. Cal. Edison Co. v. Sup. Ct.*, 37 Cal. App. 4th 839, 851 (1995). Here, Burt's feedback on Casad's draft agreement tends to show that First National did not consider or intend the Final Proposal to be binding after signing it. Burt's admissions are not the kind of after-the-fact, wholly subjective, self-serving claims to which *Winet* applies. Instead, they are objective manifestations of the parties' shared understanding and therefore admissible.

### 4.    FRIT's Motion To Limit Testimony of Gayle Lewis. [Docket Nos. 257,[10] 369].

In the parties' August 24, 2005 joint pretrial statement, First National listed Lewis as a witness as to "[c]ircumstances and communications surrounding the Final Proposal, as well as actions taken by First National and conduct in reliance on the Final Proposal." The court tentatively denied FRIT's previous motion *in limine* to exclude Lewis' testimony subject to First National making her available for a deposition. FRIT deposed her on February 3, 2006. In the parties' February 27, 2006 joint pretrial statement, First National described her testimony as pertaining to "General background on First National, Hal Dryan, and Mike Rubenstein; background on First National's operations and staff; circumstances and communications surrounding the Final Proposal, including [FRIT's] acceptance, First National's actions and conduct relating to the Final Proposal,

---

[10]    FRIT originally moved to exclude Lewis and Jim Enright from testifying. First National has indicated that it will not call Enright, thus mooting the motion with respect to him..

1   including those in reliance on it such as seeking new space, staff planning meeting following the

2   signing of the Final Proposal; and events surrounding [FRIT's] repudiation of the Final Proposal."

3   FRIT moves to limit her testimony to what First National listed in its August 24 pretrial statement.

4       The court grants in part and denies in part FRIT's motion.  On the one hand, First National's

5   August 24 statement does not cover "[g]eneral background on First National, Hal Dryan, and Mike

6   Rubenstein [and] background on First National's operations and staff."  Nor is there any indication

7   that FRIT deposed Lewis on these issues.  The court excludes this testimony.  However, because

8   First National phrased its August 24 pretrial statement so generally, FRIT overstates the extent to

9   which First National's February 27 pretrial statement expands the scope of Lewis' testimony.

10  Indeed, the August 24 statement appears to cover all of the other topics in the February 27 statement.

11  In addition, FRIT deposed Lewis on these topics.  *See* Lewis Depo. at 30-38, 43-44.  Lewis may

12  testify about them so long as she does not exceed the scope of her deposition.

13        **5.  FRIT'S Motion to Bar Evidence of Conclusions of Fact. [Docket No. 367].**

14      FRIT claims that First National's "principals have shown a propensity to testify to

15  conclusions, such as 'Guttman understood . . . .'"  Mot. Lim. at 3:2-3.  FRIT argues that such

16  testimony is "a conclusion and lacks the foundation of personal knowledge" because "one person

17  cannot read another's minds."  *Id*. at 3:4-5.  The court denies FRIT's motion without prejudice.

18  Although First National's principals likely cannot testify as to what FRIT's principals "understood,"

19  and although the court will likely sustain any objection to such testimony, FRIT does not single out

20  any particular proposed testimony to which it objects.  Rather than rule in a vacuum, the court will

21  consider individualized objections.

22        **6.  FRIT's Motion to Exclude Testimony of Steve Guttman That It Was His 'Feeling' That the Put or Call Would be Exercised. [Docket No. 361].**

23

24      FRIT contends that First National intends to offer Guttman's deposition testimony that, at the

    time he signed the Final Proposal, he felt that the parties would exercise the put or call within ten

25  years.  FRIT claims that, under *Winet*, 4 Cal. App. 4th at 1165 n.3, Guttman's subjective

26  understanding is irrelevant.  However, as mentioned above, *Winet* does not apply when a party

27  articulates his understanding of an agreement before contracting.  First National argues that it plans

28  to offer evidence that (1) the parties "discussed" a ten year lease term and (2) Hal Dryan spoke with

1    Guttman about a ten year lease before the parties signed the Final Proposal.  Although Guttman's

2    deposition testimony is not a clear admission that the parties intended the lease to last ten years, it is

3    consistent with First National's theory that the put and call options establish the boundaries of the

4    lease.  In addition, "[t]he practical interpretation of the contract by one party, evidenced by his

5    words or acts, can be used against him on behalf of the other party, even though that other party had

6    no knowledge of those words or acts[.]"  *So. Cal. Edison*, 37 Cal. App. 4th at 851.  Thus, even if

7    Guttman did not express this precise "feeling" about the options, his belief at the time of contracting

8    tends to show that FRIT was aware of the fact that the lease would likely last no more than ten years.

9
10

     **7.**     **First National's Motion to Preclude FRIT's Newly-Added Affirmative Defense or Counterclaim that First National Did Not Negotiate in Good FRITh. [Docket No. 374].**

11      First National notes that in the joint pretrial statement, FRIT has proposed that whether First

12    National "performed all of its obligations under the Final Proposal prior to the alleged anticipatory

13    breach, including the obligation to negotiate in good FRITh towards a formal agreement" is an issue

14    for the trial.  First National asserts that FRIT must seek leave of court to add either an affirmative

15    defense or a counterclaim.

16      FRIT argues that it does not intend to add an affirmative defense or a counterclaim, but

17    merely intends to show that First National cannot prove that it performed all of its obligations before

18    FRIT's alleged anticipatory breach.  The Final Proposal states "[FRIT] to prepare a legal agreement

19    for First National's review to finalize the agreement" and "[t]he above terms are hereby accepted by

20    the parties subject only to approval of the terms and conditions of a formal agreement."  FRIT

21    claims that under *Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251, 1255-63 (2002), the

22    Final Proposal required First National to try to negotiate the formal documents in good FRITh.

23    According to FRIT, if First National did not do so, this breach excused FRIT's performance before

24    the date of the alleged repudiation.

25      This argument lacks merit.  *Copeland* recognized that a breach of contract cause of action

26    could lie for breach of an agreement to agree "in an appropriate case."  *Id*. at 1256.  Copeland sought

27    to purchase Baskin Robbins's ice cream manufacturing plant and "made clear from the outset his

28    agreement to purchase the plan was contingent on Baskin Robbins's agreeing to purchase the ice

cream he manufactured there," otherwise known as a "co-packing agreement." *Id*. at 1253. The parties signed a contract that provided that they would eventually negotiate a "separate co-packing agreement." *Id*. at 1254. However, they could not agree on the numerous outstanding issues with respect to the co-packing agreement. *Id*. The court of appeal held that Copeland could have recovered reliance damages for breach of this agreement to agree if he had pursued such a theory. *Id*. at 1262-64. *Copeland* stands for the proposition that "[a] party will be liable only if a failure to reach ultimate agreement resulted from a breach of that party's obligation to negotiate . . . in good FRITh." *Id*. at 1257. Unlike *Copeland*, where Baskin Robins refused to negotiate an agreement to agree that was "critical," "a key to the deal," and unambiguously part of the underlying contract, *id*. at 1253-54, here the parties vigorously dispute whether the Final Proposal's "subject to" clause even constitutes an agreement to agree. Indeed, the Final Proposal states that the parties accept its terms "subject only to approval of the terms and conditions of a formal agreement." This clause is reasonably susceptible to the interpretation that a subsequent formal agreement could supersede the Final Proposal but need not necessarily do so. Because First National could not have exhibited bad FRITh by proceeding under the assumption that the Final Proposal did not contain an agreement to agree, this is not an "appropriate case" for recognition of the breach of such an agreement. The court grants First National's motion.

8. **First National's Motion (1) to Exclude Opinion Testimony of Mark Hennigh and (2) to Exclude Testimony of Mark Hennigh (On Only Remaining Issue of Custom and Practice). [Docket Nos. 269, 376].**[11]

First National has filed two motions concerning FRIT's proffer of testimony from Mark Hennigh. The first seeks to exclude Hennigh as a witness. At the pretrial hearing, the court indicated that Hennigh could opine about custom and practice in the real estate industry, but could not offer legal conclusions, such as (1) a reasonable person in the real estate industry would conclude that the Final Proposal was not binding, (2) the words "subject to" in the Final Proposal mean that the Final Proposal was conditioned upon a subsequent event (approval of a ground lease incorporating the Final Proposal's terms), (3) the fact the put and call provisions expire in ten years

---

[11] The court has narrowed the permissible scope of Hennigh's testimony from what it suggested it would allow at the hearing on the motions *in limine*.

1  does not mean the Final Proposal has a term of ten years, (4) the absence of a disclaimer that "this is

2  not a binding contract" does not indicate that the Final Proposal is a binding contract.  However, the

3  court indicated that Hennigh could testify about custom and practice, such as the meaning technical

4  terms among real estate practitioners.

5      FRIT then amended Hennigh's report.  First National's second motion argues that FRIT's

6  attempt to recast Hennigh's opinions "in a manner that does not state legal conclusions" is improper.

7  First National asserts that because (1) it has already structured its trial strategy and (2) has not

8  deposed Hennigh, it is too late for FRIT to alter the substance of his testimony.  First National also

9  claims that a proper foundation has not been laid for the introduction of custom and practice

10  testimony because it has not been shown that Guttman and Dryan—who negotiated the Final

11  Proposal— are members of a trade that conforms to certain general standards when drafting leases.

12      "The words of a contract are to be understood in their ordinary and popular sense . . ., unless

13  used by the parties in a technical sense, or unless special meaning is given to them by usage, in

14  which case the latter must be followed."  Cal. Civ. Code § 1644.  "Technical words are to be

15  interpreted as usually understood by persons in the profession or business to which they relate . . . ."

16  Cal. Civ. Code § 1645.  Hennigh, however, does not appear to be intending to testify to the meaning

17  of terms but rather to the subjects that are normally covered in a ground lease.  FRIT apparently

18  intends to argue that the Final Proposal was not intended to be a binding ground lease because many

19  subjects normally addressed were not covered.  In order for any testimony by Hennigh to be

20  admissible, some foundation must be established that the negotiating parties had  experience with, or

21  familiarity with,  real estate transactions and thus some knowledge about terms that are customarily

22  included in ground leases.  If that is established, then testimony by Hennigh concerning what

23  subjects are customarily included in ground leases could be relevant, depending on the testimony of

24  the negotiators, on whether the parties considered the Final Proposal as a contract between them.

25  However, Hennigh has no basis for expressing, and is precluded from, stating  the opinion that the

26  absence of a more complete agreement including particular additional subject matter means there

27  was no valid contract.  *See, e.g., Indiana Ins. Co. v. General Electric Co.*, 326 F. Supp. 2d 844,  847

28

1   (N.D. Ohio 2004) ("testimony of an expert that constitutes mere personal belief as to the weight of

2   the evidence invades the province of the jury").

3        The court does not find that testimony from Hennigh, as permitted, would not be unfair to

4   First National.  Hennigh's report sufficiently put First National on notice of such potential testimony

5   (and a lot more which the court will not allow).

6           **9.**     **First National's Motion to Exclude Evidence of a Fee Dispute Between Nicholas**

7                    **Feakins and Hal Dryan. [Docket No. 271].**

8        First National moves to exclude evidence of a fee dispute between its expert Nicholas

9   Feakins and its CEO, Hal Dryan.  The court grants the motion on relevance grounds unless FRIT can

10  prove that Feakins substantially changed his report after the dispute.  In that case, the dispute could

11  be relevant to credibility.  Of course, this ruling does not prohibit FRIT from cross-examining

12  Feakins about other aspects of his compensation.

13          **10.**     **First National's Motion to Exclude Evidence that Dryan Inappropriately**
                     **Touched Phillips. [Docket Nos. 268, 272].**

14       First National moves to exclude evidence that Dryan "inappropriately touched" Sandra

15  Phillips, a principal of New Things West, First National's former tenant.  On April 11, 2001 First

16  National and New Things West signed an agreement whereby First National terminated New Things

17  West's lease early in exchange for First National paying New Things West $100,000.  Rice Decl. Ex.

18  M.  On April 11, 2002 First National's attorney learned that Phillips claimed that Dryan touched her.

19  On December 18, 2002 First National and New Things West settled all outstanding lease issues and

20  Phllips's claim against Dryan as follows: (1) New Things West pays First National $1,500, (2) First

21  National retains New Things West's security deposit of $10,000 and (3) a promissory note executed

22  by Phillips "becomes null and void."  Rice Decl. Ex. L.

23       Because the Final Proposal provides "First National to be reimbursed $75,000 to buy out the

24  current lease holder, New Things West," FRIT argues that it should not have to pay this amount if

25  the jury determines that First National paid New Things West to settle Phillips's tort claims against

26  Dryan rather than to terminate the New Things West's lease.  This argument lacks merit.  For one,

27  the contract does not contain a condition precedent: it does not require FRIT to pay First National

28  $75,000 *provided that* First National must pay New Things West $75,000.  Thus, it does not matter

1   for what purpose First National uses the money.  Accordingly, evidence of the incident between

2   Phillips and Dryan is both irrelevant and severely prejudicial.  The court grants the motion as the

3   evidence is irrelevant and is prejudicial under Rule 403.

4       **11.      First National's Motion to Preclude Edward Storm's Testimony. [Docket No. 274].**

5

6       First National moves to preclude Edward Storm — a principal in Hunter Storm, a real estate

7   development company — from testifying about "acquisition, development, construction, and leasing

8   in the Silicon Valley, including development activities involving ground leases . . . and letters of

9   intent."  Specifically, First National objects to Storm testifying about (1) preparing letters of intent

10  for non-parties, (2) why Hunter Storm uses the language "subject to" in its letters of intent and

11  whether "subject to" means "conditioned upon" and (3) the method and timing of Hunter Storm's due

12  diligence.  First National argues that Storm has not prepared a written expert report.  FRIT asserts

13  that Storm need not prepare such a report because Fed. R. Civ. P. 26(a)(2)(b) requires experts "who

14  [are] retained or specially employed to provide expert testimony in the case" to prepare such reports,

15  and FRIT has neither retained nor specifically employed Storm here.  Apparently, FRIT contends

16  that because Hunter Storm engaged in negotiations with First National to purchase the property,

17  Storm is a "percipient expert witness" and thus not "retained" or "employed."

18      Cases involving "percipient expert witnesses" generally involve treating physicians.  The

19  majority rule is that "Rule 26(a)(2)(B) reports are not required as a prerequisite to a treating

20  physician expressing opinions as to causation, diagnosis, prognosis and extent of disability where

21  they are based on the treatment."  *Sprague v. Liberty Mut. Ins. Co.*, 177 F.R.D. 78, 81 (D. N.H.

22  1998) (collecting cases).  However, it is one thing to permit a doctor to opine about issues that are

23  normally the province of an expert — such as causation — based on his observations of the specific

24  patient and another thing to permit Storm to testify generally about real estate practices simply

25  because he once negotiated with First National.  For example, the Advisory Committee notes

26  contemplate an exception for "the expert whose information was not acquired in preparation for trial

27  but rather because he was an actor or viewer with respect to transactions or occurrences that are part

28  of the subject matter of the lawsuit.  Such an expert should be treated as an ordinary witness."

Because FRIT does not contend that Storm actually participated in any "transactions" between FRIT

and First National, the Rules require Storm to prepare an expert report.  He did not.  The court grants the motion.

**12.    First National's Motion to Preclude Brittain Cheney's Testimony as to a Limited Topic Area. [Docket No. 274].**

First National moves to preclude Brittain Cheney, a licensed real estate sales person, from testifying about "acquisition or leasing in the Silicon Valley [and] letters of intent."  Cheney did not prepare an expert report.  FRIT contends that Cheney did not need to prepare a report because he is a "percipient expert witness."  The court grants the motion for the reasons stated with respect to the Storm motion.

**13.    First National's Motion for an Order Instructing the Jury With Respect to the Relationship Between First National and D & R Partnership. [Docket No. 273].**

First National seeks an order that the jury be instructed that (1) First National had the right to lease and sell the land even though D&R Partnership owned it, (2) First National and Dryan had the authority to act on behalf of D&R Partnership with regard to execution to the Final Proposal and prosecuting this action, (3) First National was at all relevant times willing and able to perform its obligations under the Final Proposal, (4) D&R was at all relevant times ready and willing to convey its interests in the property to First National, and (5) precluding FRIT from arguing that First National did not have the authority to act for D&R Partnership or that the absence of a signature line on the Final Proposal affects the validity of the contract.  D&R owned the underlying parcel.  The five partners of D&R Partnership are also the five shareholders of First National, and each partner's share in both entities is the same.  Dryan has control over both entities.

The court denies the motion without prejudice.  First National may be entitled to such an instruction depending on the proof at trial.

**14.    First National's Motion to Exclude Evidence or Argument that FRIT Did Not Timely Accept the Final Proposal. [Docket No. 267].**

First National moves to exclude evidence or argument that FRIT did not timely accept the Final Proposal.  First National also seeks a jury instruction that because the Final Proposal's deadline for acceptance was for First National's benefit, First National could have chosen not to enforce the deadline.  The Final Proposal provided that it would "automatically expire" if not accepted by 10:00 a.m. California time on August 25, 2000.  This court's January 25, 2005 Order cited *Sabo v. Fasano*,

154 Cal. App. 3d 502, 506 (1984) for the proposition that the time limit was for First National's benefit and therefore waivable.

FRIT argues that this court's reasoning is contrary to Cal. Civ. Code § 1587(2), which provides that "[a] proposal is revoked . . . [b]y the lapse of the time prescribed in such proposal for its acceptance."  However, *Sabo* considered and rejected that argument.  *See Sabo*, 154 Cal. App. 3d at 505.  FRIT also contends that First National did not communicate its waiver to FRIT.  *Sabo* expressly declined to rule on whether a waiver must be communicated to be effective.  *See id.* at 508 n.2.  Recently, a New York district court applying California law persuasively answered the question in the affirmative.  *See Ellefson v. Megadeath, Inc.*, 2005 WL 82022 (S.D. N.Y. 2005).  Thus, factual issues remain as to whether First National informed FRIT that it had waived FRIT's alleged late acceptance.  The court denies the motion without prejudice to First National later seeking such an instruction.

### 15.    FRIT's Motion to Condition the Admissibility of Hannigan's Letter. [Docket No. 219].

FRIT moves to condition the admissibility of a December 20, 2000 letter from John Hannigan, FRIT's Managing Director of Retail Development, to Hal Dryan, First National's Chairman.  On December 15, 2000 Dryan wrote to Steve Guttman, FRIT's President and CEO.  Dryan stated that he understood that FRIT had rejected First National's response to FRIT's proposed ground lease and that the parties were "back to ground zero" and that "[t]his is the time to act our conclude our negotiations."

On December 20, 2000 Hannigan, wrote to Dryan that "[Guttman] is on vacation, but he and I have conferred and we prefer to proceed with the previously agreed upon Lease Agreement."  FRIT argues that Hannigan's statement was not an admission and thus cannot be offered to prove that the parties had a binding contract because he was not authorized to comment upon the matter.  FRIT's contention lacks merit.  Under Fed. R. Evid. 801(d)(2)(C), Hannigan's statement is made "by a person authorized by the party to make a statement concerning the subject."  For example, Hannigan expressly testified during his deposition that Guttman authorized him to "proceed with the lease."  Hannigan Depo. at 47:10-11.  The court denies the motion.

1   **16.   FRIT's Motion to Exclude Evidence that First National Would Have Exercised the Put at the End of Ten Years. [Docket No. 232].**

2

3   FRIT moves to exclude evidence that First National would have exercised the put at the end

4   of ten years.  The court's resolution of the parties early-filed motion *in limine* with respect to put

5   damages moots this motion.

6   **17.   FRIT's Motion for an Order Re: Damages from Inability to Obtain Other Properties. [Docket No. 250].**

7   FRIT moves for an order excluding evidence and argument relating to damages First

8   National suffered "based on its inability to obtain other properties at deflated values."  In First

9   National's second amended initial disclosure, Michael Rubenstein claims that First National is

10   entitled to recover such damages.  However, First National did not disclose Rubenstein as a trial

11   witness and its damages expert, Nicholas Feakins, did not purport to base his damages estimate on

12   any such damages.  First National claims that it intends to produce evidence about "its lost ability to

13   obtain such properties at deflated values . . . so that [it] can argue that the damages it seeks are

14   conservative compared to the damages it actually suffered."  First National also argues that it does

15   intend to introduce evidence "regarding [FRIT's] promise that First National could obtain other

16   properties at deflated values . . . [so] the jury can understand the context of the put provision and Mr.

17   Guttman's promises."  First National offers to stipulate to an instruction that it believe it was harmed

18   by the loss of its ability to seek replacement property at a deflated value, but does not seek to

19   recover damages for the loss because they would be difficult to calculate.  First National's proposed

20   purposes for offering the evidence are confusing and the court grants the motion under Rule 403.

21   **18.   FRIT's Motion to Exclude Witnesses in the Courtroom. [Docket No. 262].**

22   FRIT moves to exclude all witnesses from the courtroom until they are called to testify with

23   the exception of one representative per side.  First National asks that both its principals, Dryan and

24   Rubenstein, be allowed in the courtroom at the same time.  First National offers to call Rubenstein

25   first.  In the alternative, First National requests that the court inform the jury about why either Dryan

26   or Rubenstein are absent.  The court denies the motion as long as First National calls Rubenstein

27   first.

28

ORDER ON MOTIONS *IN LIMINE*
—C-03-02013 RMW
DOH

**19.    FRIT's Motion to Exclude Evidence Based on the Financial Returns FRIT is Experiencing on the Santana Row Development. [Docket No. 236].**[12]

FRIT moves to exclude all evidence based on its financial returns concerning the Santana Row development, where the property at issue is located.  Guttman commented in his deposition that FRIT's financial returns at the property have been lower than expected and that it would be his company's last mixed use complex project.  Hannigan also testified that construction costs were higher than anticipated.  FRIT claims that First National intends to argue that FRIT breached the Final Proposal because of lower than expected returns on the development.  FRIT argues that *JRS Prods. Inc. v. Matsushita Elec. Corp. of America*, 115 Cal. App. 4th 168 (2004) held that motive is irrelevant for breach of contract claims.  According to FRIT, even if the financial returns are relevant, the court should exclude them under Rule 403.

The court holds that First National can use evidence about FRIT's returns on the Santana Row project and the surrounding business climate to show that First National understood FRIT's May 11 letter as an anticipatory repudiation.  "To constitute an express repudiation, the promisor's statement . . . must amount to an unequivocal refusal to perform . . . .  To justify the adverse party in treating the renunciation as a breach, the refusal to perform must be of the whole contract . . . and must be distinct, unequivocal and absolute."  *Taylor v. Johnston*, 15 Cal.3d 130, 137, 140 (1975).  First National's awareness that Santana Row was not meeting FRIT's expectations tends to show that it justifiably viewed the May 11 letter as an attempt to renounce the contract.  In addition, FRIT can present evidence about the prevailing business climate to show that First National did not fail to mitigate damages because neither FRIT nor First National could rent Class A office space after the market collapsed.

However, First National may not offer financial returns as evidence to prove that "FRIT truly believed that the Final Proposal was . . . a binding contract" and thus its May 2001 alleged repudiation "was really just a ruse to get out of a contract that proved to be a bad deal."  Opp Mot. Lim. at 3:15-17.  First National correctly notes that *JRS* held only that a party cannot use the opposing party's "motive, no matter how malevolent" to "convert a contract action into a tort

---

[12]    First National represented that it would file a supplemental motion on the issue. However, the court's review of the docket indicates that First National has not done so.

1   claim[.]" *JRS*, 115 Cal. App. 4th at 182.  Nevertheless, whether the Final Proposal is binding hinges

2   on the text of the document itself, the parties' pre-signing communications, and their

3   contemporaneous intent.  FRIT's post-contracting "belief" is not relevant.

4        First National relies on *DCPB v. City of Lebanon*, 957 F.2d 912 (1st Cir. 1992).  In that case,

5   DCPB, an engineering firm, sued a City for breach of a construction contract.  The City

6   counterclaimed for overcharges.  A jury returned a verdict in favor of the firm and awarded

7   enhanced damages for tortious breach of contract.  The trial judge held that this was improper and

8   reduced the award.  On appeal, the City claimed that the trial judge had improperly admitted

9   "evidence, introduced by the [firm] for the cardinal purpose of proving an entitlement to enhanced

10  damages, [that] was unfairly prejudicial in connection with the claim for ordinary damages."  *Id.* at

11  918.  The First Circuit rejected this argument, reasoning that "[t]he City's defense centered around

12  its suggestion that DCPB's charges were exorbitant," and thus "[t]he disputed evidence, which

13  tended to show that the City withheld payment from DCPB not because of overcharging but for

14  purposes unrelated to the reasonableness of the invoices involved, was probative of the City's real

15  motives, hence, relevant."  *Id.*

16       First National reads *DCPB* to hold that motive evidence can be relevant in a breach of

17  contract case.  However, in *DCPB*, the City placed its motivation at issue by arguing that its

18  nonpayment was justified by DCPB's overcharges.  Here, First National seeks to use FRIT's

19  motivation for a different purpose: to cast light on the contract itself.  The fact that the Final

20  Proposal may have been a "bad deal" for FRIT cannot speak to the parties' intent at the time of

21  contracting.

22       **20.   FRIT's Motion to Exclude Evidence of First National's Damages re Lost
            Opportunity for Tax Deferred Exchange. [Re Docket No. 224].**

23

24       FRIT moves to exclude evidence that First National was damaged by the lost opportunity to

25  execute a tax-deferred exchange under IRS Code § 1031.  First National admits that it does not seek

26  damages based on this allegedly lost opportunity, but asks the court to admit the evidence to "argue

27  that the damages it seeks are conservative compared to the damages it actually suffered."  The court

28  grants the motion under Rule 403.  Admitting evidence for First National's proposed purpose would

(1) add little to the case, (2) risk confusing the jury, and (3) consume an undue amount of time.

ORDER ON MOTIONS *IN LIMINE*
—C-03-02013 RMW
DOH                                          24

1   However, at oral argument, FRIT stipulated to permit First National offer this evidence for general

2   background purposes, including to explain why the Final Proposal was structured the way it was.

3       **21.    FRIT's Motion to Exclude Evidence that Guttman Ceased Serving as CEO
          Ahead of Schedule. [Re Docket No. 233].**

4

5       FRIT moves to exclude evidence that Guttman ceased serving as FRIT's CEO and trustee

    four months ahead of schedule.  The court grants the motion on relevance grounds.

6       **22.    FRIT's Motion to Exclude Guttman's Deposition Statement. [Re Docket No.
          241].**

7

8       FRIT moves to exclude a statement that Guttman made at his deposition that he didn't know

9   whether FRIT "had the right" to "chang[e] its mind" after signing the Final Proposal.  FRIT claims

10  that Guttman's statement is irrelevant, calls for a legal conclusion, and is hearsay.  However,

11  Guttman's statement is relevant to prove that FRIT intended the Final Proposal to be a binding

12  agreement.  In addition, it does not seek to instruct the jury on the applicable law and thus is not a

13  legal conclusion.  Finally, Guttman's statement is a party admission even if he no longer works for

14  FRIT.  *See Kinser v. Gehl Co.*, 184 F.3d 1259, 1275 (10th Cir. 1999), *overruled on other grounds by*

15  *Weisgram v. Marley Co.*, 528 U.S. 440 (2000) ("Because the topics discussed in Burrough's

16  deposition excerpts all concerned events and policies occurring during his employment, the district

17  court did not err in admitting this testimony pursuant to Rule 801(d)(2).").  The court denies the

18  motion.

19      **23.    FRIT's Motion to Exclude Evidence that First National is Entitled to a
          Reasonable Broker's Fee. [Docket No. 243].**

20

21      FRIT moves to exclude evidence that First National is entitled to a reasonable broker's

    commission for reselling the property because First National did not use a broker to sell the

22  property.  First National argues that it can recover a broker's commission even if it does not use a

23  broker for resale.  However, First National's authority only supports the contention that a buyer who

24  breaches a land sale contract can recover the deposit but cannot offset the amount the seller saved by

25  reselling the property without a broker.  *See Caplan v. Schroeder*, 56 Cal.2d 515, 521 (1961).

26  Because First National did not incur broker's fees reselling the property, the court grants the motion.

27      **24.    FRIT's Motion to Preclude Stanford Berliner from Testifying With Respect to
          First National and D & R Partnership. [Docket No. 252].**

28

FRIT moves to preclude Sanford Berliner — First National and D&R Partnership's lawyer — from testifying about (1) whether the Final Proposal is binding and (2) any other testimony regarding his knowledge about First National and D&R Partnership.  FRIT claims that First National did not disclose Berliner as a person who may have discoverable information or as a potential witness until the parties exchanged draft Joint Pretrial Statements.  First National contends that Berliner will not offer opinions about whether the Final Proposal is binding.  However, First National notes that FRIT may argue that (1) First National could not deliver the property to FRIT because First National did not own the land itself and (2) some documents produced by Berliner's law firm are inadmissible on the grounds of authentication.  If FRIT does so, First National will use Berliner can establish that Dryan owned D&R, which owned the land.  This seems reasonable.  The court denies the motion.

### 25.    FRIT's Motion to Exclude May 18 Memo. [Docket No. 229].

FRIT moves to exclude evidence that Dryan wrote a memo on May 18, 2001.  The motion is moot because First National did not designate it as an exhibit.

### 26.    FRIT's Motion to Preclude Lefmann from Testifying About the Use Value of the Property. [Docket No. 223].

The parties' motion *in limine* with respect to option damages moots this motion.

### 27.    FRIT's Motion to Preclude Dryan and Rubenstein from Testifying About the Purported Legal Effect of the Final Proposal or Whether It's Binding. [Docket No. 245].

First National intends to offer Dryan and Rubenstein to testify about whether they believe the Final Proposal is binding and why.  FRIT moves to preclude this testimony.  In response, First National notes that FRIT has also designated for use at trial portions of Hannigan's and Guttman's depositions in which they testify about their belief that the Final Proposal is not binding.

The court grants the motion.  As discussed above, a party's self-serving subjective impressions of whether the Final Proposal is binding is not relevant unless he lays a foundation that he communicated this understanding to the opposing party before signing the contract.  Because whether the Final Proposal is binding is a legal conclusion, neither Dryan nor Rubenstein (nor Hannigan nor Guttman, for that matter) may offer lay opinion on this issue.  *See Evangelista v.*

ORDER ON MOTIONS *IN LIMINE*
—C-03-02013 RMW
DOH

1  *Inlandboatmen's Union of the Pac.*, 777 F.2d 1390, 1398 n.3 (9th Cir. 1985) (lay witnesses "opinion

2  as to the correct construction of the collective bargaining agreement — i.e., what is or is not the

3  proper handling grievances — is an inadmissible legal conclusion").

4

5

6  DATED:    8/3/06 _____                    *Ronald M Whyte*_____

7                                                               RONALD M. WHYTE
                                                                 United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff(s):**

Brian Hennessy          bhennessy@thelenreid.com
Daven Lowhurst          dglowhurst@thelenreid.com
Patrick Ryan            pryan@thelenreid.com
Paul Rice               price@civlit.com

**Counsel for Defendant(s):**

Nicholas Waranoff       nwaranoff@allenmatkins.com
William Huckins         whuckins@allenmatkins.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**    8/3/06                              /s/ JG
                                                  **Chambers of Judge Whyte**