United States District Court
For the Northern District of California

**E-FILED on** 6/9/09

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

FIRST NATIONAL MORTGAGE COMPANY, a California corporation,

Plaintiff,

v.

FEDERAL REALTY INVESTMENT TRUST,

Defendant.

No. C-03-02013 RMW

FINDINGS OF FACT AND CONCLUSIONS OF LAW (DAMAGES PHASE)

This action was brought by First National Mortgage Company ("First National") against Federal Realty Investment Trust ("FRIT") for FRIT's breach of a 10-year lease of the office building and land located at 350 South Winchester Boulevard in San Jose, California ("the Property") and for breach of a put option which gave First National the right to require FRIT to purchase the Property during the lease term. The lease, put option and a call option are contained in a document entitled "Final Proposal" (hereinafter sometimes referred to as "Final Proposal" or "Agreement") which was executed by the parties and dated August 24, 2000. The Final Proposal was found to be a binding agreement between the parties.

**United States District Court**
For the Northern District of California

On February 22, 2006 the court, pursuant to the stipulation of the parties, bifurcated the issues of liability and damages. The liability phase (Phase I) was tried by a jury which returned a special verdict on June 29, 2006 in First National's favor. It found:

> (1) the parties intended that the Final Proposal be an enforceable agreement between them regardless of whether they later agreed on a "formal agreement";
>
> (2) the parties intended that the language in the Final Proposal concerning the times at which the "put" and "call" options could be exercised to also set a ground lease duration of 10 years subject to the possible earlier exercise of First National's "put option";
>
> (3) the terms of the Final Proposal were clear enough so that the parties could understand what each was required to do;
>
> (4) Federal Realty anticipatorily breached the Final Proposal; and
>
> (5) First National could have performed its obligations under the Final Proposal at the time performance was called for under the Final Proposal but for Federal Realty's breach.

(Docket # 464) ("Dkt # _____").

The damages phase (Phase II) was tried by the court pursuant to the parties' stipulation to waive a jury. In their joint pre-trial statement filed April 3, 2008 the parties further agreed that "[t]he portion of Phase II regarding the right to prejudgment interest, and if so, the amount of prejudgment interest, shall be determined after the court files its Findings of Fact and Conclusions of Law as to the amount of damages (exclusive of prejudgment interest)." (Dkt # 622). The Phase II trial was held starting April 22, 2008 and concluding April 29, 2008. The parties completed their proposed findings of fact and conclusions of law and briefing on September 18, 2008.

On April 22, 2009 the court issued its proposed Findings of Fact and Conclusions of Law for Phase II and gave the parties the opportunity to file objections to them. It also requested the parties to address the right to, and computation of, prejudgment interest. The court held a hearing on the objections and the entitlement to, and calculation of, prejudgment interest. The court now issues its Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

### A. Summary of Relevant Events

FINDINGS OF FACT AND CONCLUSIONS OF LAW (DAMAGES PHASE)
C-03-02013
2

United States District Court
For the Northern District of California

1. First National was the owner and landlord of the Property until July 18, 2005, the closing date of First National's sale to Raissi Real Estate Development, LLC and Allen Mirzaei. The Property consisted of an office building with approximately 24,000 square feet of rentable space on approximately 39,000 square feet of land located at 350 South Winchester Boulevard in San Jose, California.[1] The Property is surrounded on three sides by the Santana Row project, a residential and commercial mixed-use project developed and owned by defendant FRIT or its affiliate. FRIT desired the Property as a logical part of its Santana Row project.

2. On August 25, 2000, First National and FRIT signed a document entitled "Final Proposal." The jury earlier in this action found that the Final Proposal was intended by the Parties to be a binding contract containing both a ground lease and a put option. The Parties signed the contract during the latter stage of the dot-com boom and at a time commercial real estate property values were strong. At the time of contracting, FRIT hoped to redevelop the Property and build a parking structure with a residential tower above it. FRIT was anxious to acquire the Property and had been trying to do so for some time.

3. In the Final Proposal FRIT and First National agreed, among other things, as follows:

> 1. Ground lease at $100,000 per month. Lease to include increases of 3% annually.
>
> 2. First National is given a 10 year put at a capitalization rate of 9% at the then current rental. . . .
>
> 3. Federal Realty to be given a call at the end of ten years at a 9% capitalization rate.
>
> * * *
>
> 5. First National to be reimbursed $75,000 to buy out the current lease holder, New Things West.
>
> * * *
>
> 6. Federal Realty to pay for the moving expenses of First National Mortgage not to exceed $25,000.

---

[1] Although D&R Partnership, which was controlled by the same owners as was First National, actually was the record owner of the land, while First National owned the building, the evidence during Phase I proved that First National could have and was willing to cause D&R to transfer title to the Property to whomever necessary should the put or call be exercised. Therefore, for simplicity, First National refers herein to both First National and the D&R Partnership.

United States District Court
For the Northern District of California

* * *

8. Effective date of agreement as of date of vacating premises.

(Trial Exhibit 21) ("Ex.______").

4. The ten-year lease term was to commence on First National's vacation of the premises. Although the start date was up to First National, First National sought to accommodate FRIT's redevelopment schedule. FRIT initially was going to take possession at the end of 2000. In the early part of 2001, the parties discussed a schedule by which First National would vacate by August 31, 2001.

5. Based upon a planned commencement date of August 31, 2001 for the lease, First National and its tenant, New Things West, negotiated an early termination of the lease between them which initially included a promise by New Things West to vacate by May 21, 2001. The vacation date was extended to June 30, 2001 by letter dated April 23, 2001 from Hal Dryan, Chairman of First National, to the principals of New Things West. The lease termination agreement with New Things West included a promise by First National to make an advance payment of $50,000 which it did on April 26, 2001.

6. In March 2001 FRIT indicated it would not need the Property until January 1, 2002. Dryan advised that First National was willing to accept the January 1, 2002 vacation/lease commencement date if FRIT would reimburse First National for any loss of rent and increase in relocation expenses for New Things West. Dryan confirmed this offer by letter dated March 26, 2001 to John Hannigan, Managing Director of Retail Development for FRIT.

7. On May 11, 2001 Hannigan responded to Dryan claiming the parties had not yet even reached an agreement with respect to FRIT's acquisition of the Property and any costs, such as the termination fee to New Things West, were solely First National's responsibility:

> Because we have never resolved a number of significant business issues relating to the acquisition of the Property, we still do not have a binding agreement in place for that acquisition. If and when we enter into a final agreement for an affiliate of Federal Realty to acquire an interest in the Property, we can address the items raised in your March 26 letter, however, until that time, we have no obligation to reimburse First National for any costs, expenses, lost rent or other damages incurred by First National with respect to the Property, all of which are being incurred by you at your own risk.

(Ex. 33). Hannigan's May 11, 2001 letter amounted to a repudiation of the Agreement by denying that FRIT had any binding obligation to First National. The date of the letter, May 11, 2001, is the date FRIT anticipatorily breached the Lease and Put Agreement. FRIT subsequently reiterated on several occasions its position that there was no binding agreement.

8. For the next approximately two years, the parties attempted to work out a solution for FRIT to acquire the Property, but by early 2003, those efforts proved unsuccessful, and First National filed this action on May 1, 2003. As of mid-2001 FRIT claimed it still sought to acquire the Property, but it no longer had plans to develop more residential units at Santana Row, and that if it acquired the Property, it would keep the existing building and use it for retail space.

9. In April 2005, First National entered into a contract to sell the Property to a third-party buyer (Sasan Raissi later modified to be to Raissi Real Estate Development and Mirzaei) for $10 million. Raissi intended to use the Property for a mixed-use residential-redevelopment project. Approximately 85% of the purchase price was seller-financed at 7.95 % through promissory notes signed by the buyers. Escrow closed on July 18, 2005, after which point in time First National was no longer the owner of the Property.

**B. Calculation of Rental Loss**

10. **Lease Termination Date.** The parties agreed that the lease termination date was May 11, 2001, the date of the repudiation letter.

11. **Rent Commencement Date.** The rent commencement date under the Agreement is deemed to be May 11, 2001, the date of FRIT's anticipatory breach. FRIT initially planned to take possession at the end of 2000 but the date was postponed on a couple of occasions to accommodate FRIT's development schedule. First National then in response to a request from FRIT offered a lease start date of January 1, 2002 on certain conditions as evidenced by a letter from First National to FRIT dated March 26, 2001 in which First National acknowledged that it was willing to delay the lease start date to the end of 2001 if FRIT compensated First National for not being able to collect rent from its tenant New Things West. New Things West had agreed to vacate early to accommodate FRIT's earlier expected occupancy. But FRIT never accepted First National's

United States District Court
For the Northern District of California

extension offer and did not agree to compensate First National for the lost rent during the requested extended period. FRIT did not respond to the March 26, 2001 letter until May 11, 2001 when it repudiated the Final Proposal and refused to provide First National any compensation for the lost rent addressed in First National's March 26, 2001 letter. FRIT's repudiation of the Agreement discharged any obligation of First National to vacate. *See* Conclusion of Law II.A.4.a. ("CL _____"). Further, the Phase I jury found that First National was prepared and able to perform its obligations under the lease but for FRIT's breach. Thus, as of the date of the anticipatory breach, First National was entitled to treat the lease as having commenced.

12. **Time of Award.** The time of an award for breach of a lease, absent stipulation otherwise, is the date of the judgment. However, in this case the parties stipulated:

> IT IS HEREBY STIPULATED by and between plaintiff, through its attorneys of record, and defendant, through its attorneys of record, that *Plaintiff's claim for damages shall not increase as a result of the continuance of the trial from July 11, 2005 to September 19, 2005. Plaintiff's claim for damages shall be determined as if the case proceeded to trial on July 11, 2005.*

(Dkt # 195) (emphasis added). Thereafter, in a court order dated September 12, 2005 regarding damages, the court incorporated the parties' stipulation and ordered that "[t]he date of award will be a date calculated *by adding the number of days between the first day of trial and judgment to July 11, 2005.*" (Dkt # 330 at 11:5-6) (emphasis added). At the time of that order, the difference in wording between the order and the stipulation was not significant, because trial had not been bifurcated and, as a practical matter, both wordings accomplished the desired result. The reason for the stipulation was to accommodate Dryan's schedule and to not prejudice FRIT for allowing the accommodation. However, the parties thereafter requested that the September trial date be vacated, that the case be bifurcated and that if a verdict resulted in a finding of liability that the damages phase not be set for trial for at least 240 days after the verdict.

The court accepted the parties' stipulation. The jury trial on liability did not commence until June 13, 2006 and ended on June 27, 2006 with a special verdict in First National's favor. After a number of post-verdict motions were resolved, on August 21, 2007, the court set the trial date of March 10, 2008 for the damages phase which was later re-set for April 22, 2008. Neither party raised the effect of bifurcation and the schedule changes on the previously stipulated "time of

FINDINGS OF FACT AND CONCLUSIONS OF LAW (DAMAGES PHASE)
C-03-02013
6

award" until October 31, 2007 when FRIT moved for leave to file a motion for reconsideration of the September 12, 2005 order. The request for leave was denied without prejudice subject to the issue of the time of the award being considered during the Phase II trial.

FRIT now contends that only the length of the two phases of the trial should be added to July 11, 2005 to determine what should be deemed the "time of award." First National, on the other hand, argues that the intent of the stipulation was solely to accommodate a scheduling conflict Dryan faced and the purpose of the stipulation can be met by moving two months from the pre-award period to the post-award period to account for the original two-month continuance. Any further adjustment, according to First National, would be nonsensical and not what FRIT could have understood as the effect of the stipulation. First National claims that it relied on the court's September 12, 2005 order.

The court questions whether either party affirmatively thought about the effect of the stipulation when the case was bifurcated and continued because neither brought up and clarified the issue. However, the purpose of the stipulation was to accommodate Dryan's schedule. The parties did not agree to freeze the time of award because they decided to bifurcate the trial, engage in damages discovery or postpone the damages phase if a plaintiff's verdict resulted. Therefore, the only reasonable finding is that the time of award should be adjusted only for the seventy-day delay to accommodate Dryan. Therefore, the time of award will be deemed to be seventy days earlier than the actual time of award, specifically March 30, 2009.

13**.** **Triple Net Lease.** The Agreement does not expressly say whether the rent was to be gross, triple net (property taxes, insurance, and maintenance expenses borne by the lessee) or some other type of rent. However, under the circumstances, the lease payments as described in the Agreement can only be reasonably interpreted as triple net rent. There are numerous reason for this finding including: (1) in negotiations prior to the Agreement being reached, Dryan and Steven Guttman, President and Chief Executive Officer of FRIT, discussed the fact that FRIT "would pay all of the expenses relating to the ground lease because they were going to demolish the building and erect their own structure" (Phase I transcript 89:12-90:14 ("PI Tr. _____")); (2) capitalization rates, as used in the Agreement to calculate the "put" or "call" prices, were understood by FRIT to use

United States District Court
For the Northern District of California

triple net rates and (3) Guttman knew that is the way ground leases work. "Mr. Guttman said that Federal Realty would pay all the expenses for the property. And he said that's the way ground leases work, the tenant pays all of the expenses." (Phase II Tr. 159:8-14; 162:4-9)[2].

14. **Scheduled Rent to Time of Sale Per the Agreement.** The rent called for in the Agreement between the parties was "$100,000 per month . . . to include increases of 3% annually." Ex. 21. Therefore, the scheduled rent to the time of sale on July 18, 2005 is as follows:

| 5/11/2001-5/11/2002 | 5/11/2002-5/11/2003 | 5/11/2003-5/11/2004 | 5/11/2004-5/11/2005 | 5/11/2005-7/18/2005 | Total |
|---|---|---|---|---|---|
| $1,200,000 | $1,236,000 | $1,273,080 | $1,311,272 | $251,621 | $5,271,973 |

15. **Mitigation of Rent Damages to Time of Sale.** First National sought to rent the portion of the premises that it did not occupy following May 11, 2001 and acted reasonably and in good faith in doing so. This finding is based on the following facts, among others:

a. First National obtained $726,803 in net rental income from the date of breach until the sale as follows:

| 5/11/2001-2002 | 5/11/2002-2003 | 5/11/2003-2004 | 511/2004-2005 | 5/11/2005-7/18/2005 | Total Pre-Sale Rents |
|---|---|---|---|---|---|
| $152,456 | $228,691 | $220,275 | $125,357 | $24 | $726,803 |

FRIT acknowledged that between May 2001 and November 2002, First National obtained reasonable rental income. "We accept … the actual rental income from May 2001 to November 2002 as the reasonably attainable income. We do not contend they could have done better." (Phase II transcript 1120:15-22 ("Tr._____"); (Exs. 1051.005, 1093). Lengthy construction activity by FRIT surrounding the subject property from the date of breach through at least the opening of Santana Row in November 2002 detracted from the marketability of the Property. First National performed as well, if not better, during the initial May 2001 to November 2002 period than could reasonably have been expected in the rental market, given market conditions, and the nature and circumstances with respect to the subject Property.

---

[2] FRIT's objection to this testimony is overruled. The testimony is not inconsistent with Dryan's 30(b)(6) deposition considered in context.

**United States District Court**
For the Northern District of California

b. FRIT, after the breach, represented to First National that FRIT still intended to acquire the Property at a reasonable price and specifically requested that First National enter only short-term leases so that FRIT could acquire the property unencumbered. First National reasonably relied on FRIT's representations and requests in deciding on how best to mitigate damages, including the fact that First National primarily sought short-term tenancies initially.

c. Although First National did not utilize a real estate broker to assist in renting the premises, First National had a history over more than two decades of successfully leasing the premises without the use of retained brokers. First National's principals were onsite, since they maintained an office at the property, and were able to directly market and show the property. First National offered full commissions to brokers who procured tenants. First National's principals were knowledgeable about the Property and understood real estate financing. When vacancies occurred, First National employed appropriate property signage and use of a marquee on Winchester Boulevard, a high volume street in San Jose. First National was motivated to lease the Property and the evidence is not persuasive that a different approach to leasing the Property would have been more successful.

d. The rental market for buildings such as the subject Property during the period between May of 2001 and July of 2005 was difficult. There was a trend in favor of higher class properties due to rental rate compression. The subject Property was considered a Class C or low-end Class B property and had poor parking. Although the proximity to Santana Row had some advantages, the Property itself lacked visibility due to the surrounding construction of the Santana Row structures and the eventual placement of the Santana Row structures. FRIT marketed for several years 31,000 square feet of Class A office space right next door to First National, but was never able to lease the property for office uses and eventually had to convert it to a health club at significant cost in order to lease the property. This brand-new Class A office space was marketed before and primarily after it actually came on the market in or around November 2002.

e. First National's major tenant New Things West moved out due to First

United States District Court
For the Northern District of California

National's anticipation of FRIT's taking possession which left a significant amount of space vacant as of July 2001.

f. FRIT did not prove that a larger portion of the rental loss First National suffered as a result of FRIT's failure to lease the premises as promised could have been reasonably avoided.

16. **Scheduled Rent from Time of Sale to Time of Award Under the Agreement.** The scheduled rent from the time of sale on July 18, 2005 to March 30, 2009, the date deemed to be the "time of award," is as shown below.

| 7/18/05-5/11/06 | 5/11/06-5/11/07 | 5/11/07-5/11/08 | 5/11/08-3/30/2009 | Total |
|---|---|---|---|---|
| $1,098,990 | $1,391,129 | $1,432,863 | $1,306,015 | $5,228,997 |

17. **Reasonableness of the 2005 Sale of the Property.** First National entered into a Commercial Property Purchase Agreement and Joint Escrow Instructions for the sale of the Property to Raissi Real Estate Development and Mirzaei for $10,000,000 on April 15, 2005. Escrow closed on July 18, 2005. First National took back a note for $8,000,000 at an interest rate of 7.95% secured by a deed of trust. The $10 million sale price represented a reasonable market value of the Property at the time. The $10 million sale price was $2.8 million higher than an offer received by First National in November 2004 from Hunter-Storm. The sale price was also $2.8 million higher than what FRIT paid for 360 South Winchester when the market was still strong in late 2000. 360 South Winchester was directly adjacent to, and had twice the land area of, the Property. Although First National's owner financing on the sale of the subject Property suggests the actual value of the transaction was less than $10 million, two factors nevertheless support the $10 million value. First National obtained a speculative right to buy two condominiums in Raissi's proposed development at a 25% discount and the market for buildings such as the subject Property was improving.

FRIT argues that offers Raissi received for the Property in the latter part of 2005 suggest that it had a fair market value of more than $10 million at the time of sale. The evidence did show that property for residential development was increasing in the latter half of 2005. However, in July 2005 $10,000,000 appears to have been a reasonable valuation and the product of an arms-length

United States District Court
For the Northern District of California

transaction. The real estate market had been volatile over the years so pinpointing value at a particular time is difficult. The evidence suggests that First National sought the best deal it believed it could reasonably get and that it acted in a good faith effort to mitigate its damages by the sale. The court is satisfied that a reasonable estimate of the fair market value of the Property as of July 18, 2005 is $10 million.

18. **Proceeds of Sale Considered Imputed Rent to Mitigate Pre-Award Rental Loss.**

Pursuant to the parties' stipulation that rental damages are to be determined pursuant to Cal. Civ. Code § 1951.2, First National is entitled to the scheduled rent less the rent that FRIT proved could reasonably have been avoided by First National. Since the sale was reasonable and yielded more funds than could have been expected if First National had retained the building and continued to attempt to rent it, FRIT did not prove that more of the rental loss could have been reasonably avoided by First National.

19. **Calculation of Imputed Rent.** The court finds that using an 8.0% capitalization rate is an appropriate way to determine a reasonable imputed rental value for the period from the sale to the effective time of award. This rate is based on the expert testimony presented at trial on this issue, the capitalization rates applicable in the July 2005 timeframe for similar buildings, the nature and circumstances of the July 2005 sale transaction, and the economic circumstances then existing in the office and redevelopment real estate markets. A capitalization rate of 8.0% applied to the $10 million sale price results in an imputed rental value of $800,000 per year.

FRIT argues that leases of the type involved here would ordinarily include a yearly escalation. There was little evidence offered to support any escalation. Further, the way of calculating the imputed rent suggests escalation is not appropriate. The imputed rent in essence reflects the return on the property being fully used as imputed rent. Given these factors, the court finds that there should not be escalation of the imputed rent figures. The imputed rent from the date of sale, July 18, 2005, to the effective time of award, March 30, 2009, is as follows:

| 7/18/05-5/11/06 | 5/11/06-5/11/07 | 5/11/07-5/11/08 | 5/11/08-3/30/09 | Total |
|---|---|---|---|---|
| $650,959 | $800,000 | $800,000 | $707,945 | $2,958,904 |

FINDINGS OF FACT AND CONCLUSIONS OF LAW (DAMAGES PHASE)
C-03-02013
11

United States District Court
For the Northern District of California

20. **The Subject Property Was Relet and then Sold in a Good Faith Effort to Mitigate Damages.** Cal. Civ. Code §§ 1951(a)(3) and 1951.2(c)(2) permit recovery for rental loss after the time of award only if the Property was relet prior to the time of the award. The reason for the rule is to prevent a lessor from getting a judgment for the balance of the lease term and subsequently reletting the premises to another tenant and thereby receiving a double award. *See infra*, CL at II.A.5a. Here, First National did not fully relet the Property for the period covered by the lease to FRIT. However, at the time of sale, 50% of the building was leased to tenants First National and Fan Club. That leasing meets the requirements of Cal. Civ. Code §§ 1951(a)(3) and 1951.2(c)(2) with respect to 50% of the building. First National acted in good faith in that leasing and the subsequent sale of the Property.

21. **Scheduled Rent from Time of Award to End of Lease.** The scheduled rent from March 30, 2009, the date deemed to be the time of award, to the end of the lease is as follows.

| 3/30/2009-5/11/2009 | 5/11/2009-5/11/2010 | 5/11/2010-5/11/2011 | 50% of Total |
|---|---|---|---|
| $169,834 | $1,520,124 | $1,565,728 | $1,627,843 (50% of $3,255,686) |

22. **Imputed Rent for Post-Award Damages.** The imputed rent from the time of award to the end of the lease based upon an 8% capitalization of the Property's sale price totals as follows.

| 3/30/2009-5/11/2009 | 5/11/2009-5/11/2010 | 5/11/2010-5/11/2011 | 50% of Total |
|---|---|---|---|
| $92,055 | $800,000 | $800,000 | $846,027 (50% of $1,692,055) |

23. **Discount Rate for Post-Award Damages.** Civil Code §1951.2(b) provides that "the worth at the time of award of the amount referred to in paragraph 3 of subdivision (a) (post-award rent damages) is computed by discounting such amount at the Discount Rate of the Federal Reserve Bank of San Francisco at the time of award plus 1 percent." As of March 30, 2009, the court takes judicial notice of the fact that this rate was .5%, which when increased by 1 percent, results in an applicable rate of 1.5%. Therefore, discounting the difference between the worth of the scheduled rent and the imputed rent results in the following loss.

| 50% of the Scheduled Rent from the Time of Award to the End of the Lease | 50% of the Imputed Rent from the Time of Award to the End of the Lease | Worth at the Time of Award of the Amount by Which 50% of the Scheduled Rent Exceeds Amount of Imputed Rent | Worth at the Time of Award of the Amount Discounted at the Rate of 1.5% |
|---|---|---|---|
| $1,627,843 | $846,027 | $781,816 | $769,403 |

**C. Value of Put Option on Date of Repudiation Less Mitigation**

24. A put option of the type involved here has an intrinsic value and an extrinsic value. Intrinsic value is essentially the amount by which the put option price exceeds the fair market value of the optioned property at a particular time. The extrinsic value is the added value, if any, resulting from the flexibility the optionee has as to when to exercise the option and at what price. Therefore, the value of the put option to the holder, First National, on May 11, 2001 was the difference between the price at which it could require FRIT to purchase the Property and the fair market value of the Property plus any extrinsic value. No evidence was introduced estimating the extrinsic value, i.e. that the option value would have been greater because First National had a 10-year period in which it could have decided when to exercise the option. By May 11, 2001 the real estate market had softened significantly from August 25, 2000 when FRIT agreed to the put option. First National makes no attempt to claim that the put option had any extrinsic value at the time of FRIT's repudiation.

25. On May 11, 2001 the put option price was $13,333,333 (($100,000/month x 12 months) ÷ (.09 capitalization rate)). The parties' respective appraisers differed significantly in their estimates of the fair market value of the Property as of May 11, 2001. The Property was at the time somewhat unique in that it had a current highest and best use as an office building but also had some potential for redevelopment. Neil Lefmann, an MAI appraiser called by First National, estimated the fair market value at $5,200,000. Drew Arvay, a real estate broker, who was also retained by First National, estimated the value at $5,217,000. Both looked at comparable sales and capitalization rates in forming their opinions. Norman Hulberg, an MAI appraiser, testified for FRIT and estimated the fair market value at between $9.55 and $13.11 million. The opinions of all

three experts seemed colored by a bias for the party who retained them. Hulberg based his opinion in part on comparable sales but also used a method of calculation of questionable reliability. His opinion included consideration of two data points from 2004 which do not appear to be useful data points on which to base a reliable appraisal: (1) an offer by First National to sell the building in late 2004 for $10,000,000 which was not accepted and (2) an admitted "guesstimate" by Dryan in 2004 that the property was worth about $8,500,000. Hulberg also considered the $10,000,000 sale by First National to Raissi in 2005. Adjusting a sale in 2005 to reach an estimate of the Property's value in 2001 seems problematic, particularly in a volatile market as existed here. In contrast, Lefmann's and Arvay's reliance on comparable sales and capitalization rates relatively close in time to May 11, 2001 to estimate the Property's value appears to be a more appropriate approach. However, both Lefmann and Arvay appear to have underestimated the redevelopment potential of the Property and to have treated the building as being in a slightly lower class than it was. The court makes an upward adjustment on Lefmann's and Arvay's appraisals and finds that the fair market value of the Property as of May 11, 2001 to be $6,500,000. Therefore, before taking into consideration mitigation obtained from the sale of the Property, First National's damages for the loss of the put on the date of breach exclusive of interest is $6,833,333 ($13,333,333 - $6,500,000).

26. The sale of the Property for $10,000,000 enabled First National to mitigate its damages from loss of the put option. The imputed rent credited against First National's lease damages is in effect a substitute for a credit FRIT wold have been entitled to for rent received if the Property had not been sold. None of the $10,000,000 sale price itself was used to mitigate the lease damages. The question, then, is whether the sale mitigated the put damages which were calculated by subtracting the fair market value of the Property of $6,500,000 on the date of breach (May 11, 2001) from the put price on that date of $13,333,333. To determine whether the sale mitigated the loss, the $10,000,000 value received on July 18, 2001 must discounted to its value as of May 11, 2001. The court uses the Federal Reserve Bank of San Francisco's discount rate as of May 11, 2001 (4%) plus 1% or a total of 5%. That appears to be a fair discount rate to use under the circumstances and is the same as used by statute to discount the worth of future rent. The discounted value of the $10,000,000 as of May 11, 2002 is $8,152,583 ($10,000,000*(1.05^(-4.1863))=$8,152,583). That

United States District Court
For the Northern District of California

amount exceeds the fair market value of $6,500,000 used to determine the amount of the put option loss. Therefore, the July 18, 2005 sale mitigated the put option loss in the amount of $1,652,583 ($8,152,583 - 6,500,000).

FRIT argues that the profits First National made between May 11, 2001 and the date of sale reduces further the loss suffered. However, those rental receipts were already used in mitigating the lease damages and use again would result in double counting.

**D. New Things West Reimbursement.**

27. **New Things West Early Termination Compensation.** The Agreement calls for First National to be reimbursed $75,000 for the buy-out of the lease of New Things West. FRIT has not made that payment, and, therefore, it is owed along with prejudgment interest.

## II. CONCLUSIONS OF LAW

### A. Lease Damages

#### 1. Standards for Determining Rental Loss

First National and FRIT stipulated that Cal. Civil Code § 1951.2 governs the measure of rent damages. (Dkt # 196). Section 1951.2(a) divides rental damages into three time periods, two of which are relevant here:

> (a). . . [I]f a lessee of real property breaches the lease and abandons the property before the end of the term or if his right to possession is terminated by the lessor because of a breach of the lease, the lease terminates. Upon such termination, the lessor may recover from the lessee:
>
> * * *
>
> (2) The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the lessee proves could have been reasonably avoided;
>
> (3) Subject to subdivision (c), the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the lessee proves could be reasonably avoided; and
>
> (4) Any other amount necessary to compensate the lessor for all the detriment proximately caused by the lessee's failure to perform his obligations under the lease . . . .

(Cal. Civ. Code § 1951.2(a)). The parties further agreed that First National's "claim for damages *shall not increase as a result of the continuance of the trial from July 11, 2005 to September 19,*

FINDINGS OF FACT AND CONCLUSIONS OF LAW (DAMAGES PHASE)
C-03-02013

15

**United States District Court**
For the Northern District of California

*2005. Plaintiff's claim for damages shall be determined as if the case proceeded to trial on July 11, 2005*." (Dkt # 195) (Emphasis added). The court found that the consequence of the parties' stipulation is that March 30, 2009 should be deemed to be the "time of award" under Cal. Civ. Code Section 1951.2 (a). (Finding of Fact # 12 ("FF # _____")). Thus, the relevant damages periods are the "pre-award" period of May 11, 2001 (the date found to be the lease commencement date) to March 30, 2009 and the post-award period of March 30, 2009 to May 11, 2011, the termination date of the lease in the parties' Agreement.

**2. FRIT's Threshold Argument that First National Suffered No Damages Is Without Merit**

FRIT argues that First National is not entitled to any damages because the lease was to commence on the date First National vacated. Since that date was in the exclusive control of First National, FRIT now contends the contract was a unilateral one that FRIT revoked before First National vacated, that the contract lacked consideration and that the contract was illusory. FRIT's argument is untimely and without merit. Questions of liability were raised and decided in Phase I by a jury and FRIT made no contention that the contract was unilateral, lacked consideration or was illusory. The jury found that there was a lease and that FRIT breached it. Not only has FRIT already lost on liability, raising the issue for the first time now would be unfair to First National. First National had taken action to turn over possession to FRIT but had not vacated by the time of FRIT's breach because it was trying to accommodate FRIT's construction schedule. In any event, the law implies a duty to move out within a reasonable time if no date is specified. Cal. Civil Code § 1657 provides "[i]f no time is specified for the performance of an act required to be performed, a reasonable time is allowed." It is disingenuous for FRIT to now argue that First National had not vacated within a reasonable time as no evidence suggests it was not prepared to vacate on a date reasonably selected by FRIT. In summary, FRIT's threshold argument is rejected because the Agreement was not unilateral given the respective obligations of the parties, First National had an obligation to vacate within a reasonable time which it was prepared to do, and a jury has already determined liability precluding FRIT from raising the issue it now belatedly asserts.

**3. Agreement Contained Triple Net Lease**

FRIT disputes First National's contention that the lease between the parties was a triple net lease. The Agreement does not expressly say that the lease is triple net but the language used and circumstance existing show that the parties entered into a triple net lease. What the Agreement says is "Ground lease at $100,000 per month. Lease to include increases of 3% annually." (Ex. 21). The facts including that the Agreement called for a ground lease, that FRIT was planning major construction, and that prices for the parties' put and call options were based upon the lease payment figures are among those that show the parties intended and entered into a triple net lease. "If the terms of a promise [FRIT's lease payment obligation] are in any respect ambiguous, it must be interpreted in the sense in which the promisor [FRIT] believed, at the time of making it, that the promisee [First National] understood it." Cal. Civ. Code § 1649. Gutman knew that First National understood the lease to be triple net. (FF # 13). Further, extrinsic evidence is relevant to prove a meaning to which the language of an instrument is reasonably susceptible. *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 37 (1968). Here, the extrinsic evidence established that the parties intended the $100,000 per month to be a net figure. (FF # 13). "A contract must be so interpreted as to give effect to the mutual intent of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636.

FRIT's claim that the Statute of Frauds precludes interpreting the Agreement as calling for a triple net lease is without merit. FRIT argues that rent is an essential element of a lease, that the Statute of Frauds requires essential elements to be stated with reasonable certainty and that the Final Proposal does not state with reasonable certainty that FRIT is obligated to pay triple net charges. However, the Final Proposal provides a sufficient written memorandum to show the essentials of the Agreement and the nature of the rent to which the parties agreed. In light of the provisions of the Agreement and under the circumstances existing at the time the Agreement was entered into, it is only reasonable to infer that the Agreement called for triple net lease payments.

**4. Pre-Award Rental Loss**

**a. Lease Commencement Date**

Since FRIT anticipatorily breached the Lease, the requirement that First National

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

vacate the premises to start the Lease was discharged. "[O]ne of the consequences of a repudiation is that it may discharge the other party's duties to render performance. (Rest.2d Contracts, § 253, subd. (2), p. 286.) In other words, 'one party's repudiation discharges any remaining duties of performance of the other party with respect to the expected exchange.' (*Id.*, com. b, p. 287.)" *Central Valley General Hosp. v. Smith*, 162 Cal.App.4th 501, 520-21 (2008).

**b. No Rental Loss Could Have Reasonably Been Avoided Before Sale**

Under Cal. Civil Code Section 1951.2(a)(2) First National is entitled to the rent due under the Agreement less the amount of rental loss that FRIT proved could have been reasonably avoided. Neither party disputes that up until the sale of the Property to Raissi, First National collected rent in the amount of $726,803. The court found that FRIT did not show that First National could have reasonably avoided any of its rental loss. (FF # 15(a)-(f)). The scheduled rent for this period was $5,271,973 and the rent recovered by First National was $726,803.

**c. Sale Proceeds Mitigated Loss**

FRIT argues that First National is not entitled to any rental loss occurring after the sale to Raissi. However, the sale was made to mitigate First National's rental loss and actually yielded more than First National could have obtained by continuing to try and rent the Property. (FF # 17). Therefore, FRIT did not show that the sale constituted a rental loss that First National could have reasonably avoided.

In *Millikan v. American Spectrum Real Estate Services California, Inc.*, 117 Cal. App. 4th 1094 (2004), the court held:

> that sale of the property by the landlord following the tenant's abandonment of a lease does not deprive the landlord of its available contract remedies under section 1951.2. The landlord retains the right under section 1951.2 to claim rental loss accruing after the date of sale, except to the extent the breaching tenant can prove the rental loss was avoidable, together with consequential damages under subdivision (a)(4), under standard contract principles.

*Id.* at 1104. The court further pointed out that a rental stream of a value equivalent to the sale proceeds can be determined using a market capitalization rate.

> If the property is sold, other means are available by which the tenant may prove avoidable rental loss. Most commonly, if one assumes the income producing property is sold at its fair market value, the sale price is "the capitalized value of the reasonable net rental value attributable to the land and existing improvements."

FINDINGS OF FACT AND CONCLUSIONS OF LAW (DAMAGES PHASE)
C-03-02013

18

United States District Court
For the Northern District of California

> (Evid.Code, § 819.) The appropriate market capitalization rate could be established by reviewing sales of comparable leased premises. With an assumed capitalization rate based on the sales of comparable properties, and the known sale price for the subject building, the equivalent rental stream may be determined and compared with the rental loss resulting from the tenant's abandonment. By this means, the tenant may establish whether the landlord has recovered his lost rental, in whole or in part, by a favorable sale. While this evidence would necessarily require expert opinion testimony, it is the type of evidence often offered in other contexts where property valuations are in issue. And, of course, the tenant is also free to prove that a greater rental loss could have been avoided by retaining the building rather than selling it, or that the sale price was unreasonably low.

*Id.* at 1102. In the instant case expert testimony and evidence of capitalization rates from sales of other properties showed that a fair capitalization rate for the subject Property was 8% at the time of the sale. (FF # 19). Therefore, the imputed rent for the period from the date of sale (July 18, 2005) until the time of award (deemed to be March 30, 2009) was $800,000 per year or a total of $2,958,904. The scheduled rent for this period was $5,228,997.

**5. Post-Award Rental Loss**

**a. Effect of Sale of the Property**

Cal. Civ. Code § 1951.2(c)(2) expressly conditions post-award damages on the lessor's "reletting" of the property prior to the date of the award. The word "relet" does not by definition include a sale. Therefore, First National is literally precluded from recovery of post-award damages based solely on its alleged mitigation by sale.

First National relies on *Millikan* where the court stated in *dicta* that "we find nothing in the law, or in reason, that would prohibit a landlord from selling the property to mitigate his loss, provided the trier of fact finds a sale to be a reasonable means to avoid the further loss of rental revenue." 117 Cal. App. 4th at 1100. However, *Millikan* involved a lease provision that expressly provided for post-award damages, and the court specifically commented that when the lease does not so provide, reletting is required. "The recovery of lost rental revenue accruing for the balance of the term after the date of judgment under section 1951.2, subdivision (a)(3) is conditioned upon the lease providing this remedy, or, *if the lease does not provide this remedy, the property must actually be relet before the time of the award. Id.* at 1101 (emphasis added). Admittedly, a sale would satisfy the concern which Civil Code § 1951(c)(3) seems to address, namely the "fear a landlord would win a judgment for damages for the remainder of the lease and then relet the lease to another

**United States District Court**
For the Northern District of California

tenant, in essence receiving a double award." *California Safety Center, Inc. v. Jax Car Sales*, 164 Cal. App. 3d 992, 1000 n.8 (1985); *see* The Rutter Group, CALIF. PRACTICE GUIDE, Landlord - Tenant § 7:479.1 (2008). However, the statute expressly requires reletting and makes no mention of a sale, and the court cannot re-write the statute. The current statute contrasts with section 1951.2(a)(3) as originally proposed.

> [S]ection 1951.2(a)(3), as originally introduced would have permitted the landlord to recover at the time of judgment the amount of damages which would have accrued subsequent to the date of the judgment, less the amount the tenant proves could be reasonably avoided. As introduced, the section would have permitted the landlord to be fully compensated at the time of the award, even if there had been no rerenting or accelerated damages clause in the lease.

2 Pacific Law Journal 259, 266-67 (1971) (footnotes omitted). The original version was amended to include the reletting requirement.

First National did relet a portion of the property. FRIT maintains that section 1951.2(c)(2) requires that the entire property must be relet to get post-award damages. This is not a sensible interpretation of the statute. The reletting of part of the property could assuage any concern about a double recovery with respect to at least that portion of the property. Here, First National had the Property fully leased at some points in time after FRIT's breach and prior to the time of award. However, the Property was not fully leased at the time of sale and the sale obviously occurred before the time of award. Although generally the reletting requirement's purpose suggests that the reletting would have to cover the post-award period to insure no double recovery, the statute does not expressly require that and here the reletting followed by the sale negates any chance for First National to make a double recovery. Therefore, First National's leases to itself and to Fan Club of 50% of the premises, which were in effect at the time of the sale, fulfill the requirement of Civil Code § 1951.2(c)(2) with respect to that 50%. First National acted in good faith in the reletting and subsequent sale of the Property. Therefore, it is entitled to the worth at the time of award of the amount by which the unpaid rent for 50% of the premises for the balance of the term after the time of award exceeds the amount of the imputed rent for 50% of the premises for that period. The imputed rent calculated from the sale proceeds for the period from the time of award (deemed to be

United States District Court
For the Northern District of California

March 30, 2009) to the end of the lease (May 11, 2011) totals $846,027. The scheduled rent for this period was $1,627,843.

**b. Post-Award Rental Damages Must Be Discounted**

Since an award of post-award rental loss is made before the rent would have been due under the lease, the law recognizes that the worth at the time of award must reflect a discounted amount. Cal. Civ. Code § 1951.2(b) requires discounting at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus 1%. In this case, the Federal Reserve Bank of San Francisco discount rate on March 30, 2009 was .5% which means that the appropriate discount rate to be applied is 1.5%.[3] Therefore, post-award rental damages are calculated by subtracting the imputed rent of $846,027 from the scheduled rent of $1,627,843 and discounting the result at the rate of 1.5%. The result is a rental loss of $769,403.

**c. Pre-Judgment Interest**

First National is entitled to interest at the legal rate on each payment of rent not made, from the date it was due through the time of award (March 30, 2009[4]). Cal. Civil Code § 1951.2(b). The applicable legal rate is 10% per annum. Cal. Civil Code § 3289(b). Therefore, prejudgment interest on the lease damages totals $3,001,680.

**B. Damages from Breach of Put Option**

**1. Valuation of Put Option**

The put option had an intrinsic value and an extrinsic value. Here, the intrinsic value is the amount by which the put option price exceeded the fair market value of the Property on May 11, 2001. The extrinsic value is the added value, if any, resulting from the flexibility that First National enjoyed from the 10-year period in which it could have decided to exercise the option. By May 11, 2001 the real estate market had softened significantly from August 25, 2000 when FRIT agreed to the put option. First National makes no attempt to claim that the put option had any extrinsic value

[3] Since the date deemed to be the time of award is actually before the date of judgment, First National is entitled to post-award interest beginning March 30, 2009.

[4] Since the date deemed to be the time of award is actually before the date of judgment, First National is entitled to pre-judgment interest through March 30, 2009.

United States District Court
For the Northern District of California

at the time of FRIT's repudiation. Based upon the court's evaluation of the testimony of the appraisers and the evidence, the court found the intrinsic value of the option to be $6,833,333. (FF # 25). Although the option also had some theoretical extrinsic value, no amount was shown by the evidence.

**2. Method of Evaluation**

FRIT asserts that estimating the value of the put option as the difference between the fair market value of the Property and the put price is contrary to law and cites *Schmidt v. Beckelman,* 187 Cal. App. 2d 462, 468-71 (1960). FRIT extends *Schmidt* beyond its holding. In that case the plaintiff sought to have defendants' option to purchase declared void and the defendants/cross-complainants sought damages for the breach of their option rights. The trial court erroneously awarded damages based upon the difference between the exercise price of the option and the fair market value of the property. The court of appeals did not hold that the method of valuation was necessarily wrong—it merely held that the value of the particular option was a factual matter for determination under all the circumstances of the case and that there was a lack of evidence presented relevant to value. Further, in *Schmidt* the optionees had an option to purchase not a put option, had not made a tender of the option price, had not indicated an intent to exercise the option and had not shown they had the funds on hand to do so. In the instant case, First National had the right to require FRIT to purchase the Property and FRIT had repudiated that obligation. Substantial evidence was introduced showing that the intrinsic value of the option was the option price less the fair market value of the Property and that no additional value should be included for the exercise date flexibility controlled by First National. This valuation, if anything, undervalued the option as of the date of breach. *See Scully v. US WATS*, 238 F.3d 497, 511 (3rd Cir. 2001) (pointing out that the intrinsic value of a stock option generally undervalues the true value of a stock option because the option holder can wait until an opportune time to exercise the option). *Schmidt* did not suggest that any particular valuation method is precluded if testimony supporting the valuation is introduced. In *Scully* the court analyzed the calculation of damages under a breach of contract approach for a denial of plaintiff's right to exercise stock options and held that it involves taking the difference between

United States District Court
For the Northern District of California

the option's exercise price and the market value of the stock at the time of the breach. *See id.* at 510-13

**3. Mitigation of Damages for Loss of Put**

FRIT maintains that it is entitled to reduce the amount of First National's damages for the loss of the put because First National recouped some of that loss when it sold the Property on July 18, 2005. FRIT asserts that the put option damages should be calculated by subtracting the resale price of $10 million from the exercise price of $13,333,333, and then adjusting the result to reflect First National's profit during the period from May 11, 2001 to July 18, 2005.

First National, on the other hand, contends that the court in calculating damages must adjust the imputed rental value computed from the sale proceeds to prevent a partial double off-set of those proceeds. It submits that if the post-sale offsets of imputed rent are discounted back to July 2005 and the fair market value of the Property as of May 11, 2001 is adjusted to an equivalent price in July 2005 taking into account the time-value of money, the amount by which the sum exceeds $10,000,000 is the amount of adjustment that must be made to preclude partial double counting.

The court does not believe either party's approach is entirely correct. With respect to the lease damages, the imputed rent is in effect a proxy for the rent that would have been generated had the property not been sold. The form of the asset just changed and an imputed rent was determined using an appropriate capitalization rate. Therefore, none of the $10,000,000 sale price was used to mitigate the lease damages. The question, then, is whether the sale mitigated the put damages which were calculated by subtracting the fair market value of the Property of $6,500,000 on the date of breach (May 11, 2001) from the put price on that date of $13,333,333. To determine whether the sale mitigated the loss, the $10,000,000 value received on July 18, 2005 must discounted to its value as of May 11, 2001. The court uses the Federal Reserve Bank of San Francisco's discount rate as of May 11, 2001 (4%) plus 1% or a total of 5%. That appears to be a fair discount rate to use under the circumstances and is the same as used by statute to discount the worth of future rent. The discounted value of the $10,000,000 as of May 11, 2001 is $8,152,583 ($10,000,000*(1.05^(-4.1863))=$8,152,583). That amount exceeds the fair market value of $6,500,000 used to determine the amount of the put option loss. Therefore, the July 18, 2005 sale mitigated the put option loss in the amount of $1,652,583 ($8,152,583 - 6,500,000).

United States District Court
For the Northern District of California

FRIT's argues that the profits First National made between May 11, 2001 and the date of sale reduces further the loss suffered However, those rental receipts were already used in mitigating the lease damages and use again would result in double counting.

**4. Prejudgment Interest**

The parties dispute First National's entitlement to prejudgment interest on the put damages. Cal. Civil Code section 3287(a) provides for prejudgment interest if the damages are "certain or capable of being made certain by calculation." In this case, reasonable mind could differ on what the correct approach is to the calculation of damages for loss of the put option. Further, whatever formula is used necessarily involves determination of the fair market value of the Property which was subject to substantially differing opinions. Therefore, the damages could not be considered "certain or capable of being made certain by calculation." *Id.*

Cal. Civil Code section 3287(b), however, allows the court, in its discretion, to award prejudgment interest from a date prior to the entry of judgment but no earlier than the date the action was filed. On one hand, First National did not have the use of the funds representing the put damages during the course of the litigation. On the other hand, FRIT had a reasonably persuasive position in the litigation. Further, First National is entitled to prejudgment interest on a majority of its damages at the rate of 10% which is significantly higher than market rates that existed during the litigation period. The court in its discretion denies prejudgment interest on the put damages.

**C. First National Is Entitled to Damages for Both Breach of the Lease and Breach of the Put Option**

FRIT argues, and the court initially tentatively suggested the possibility, that First National should be considered to have exercised its put option on the date that it treated FRIT as having repudiated the Agreement and be precluded from collecting for both its rental loss and the loss of the option. This contention has some appeal since, if the Agreement had been carried out, First National would obviously have been unable to claim rent after it had required FRIT to buy the Property. However, if First National had to make an election after FRIT repudiated the Agreement, First National would be deprived of the benefit of its bargain. Common sense dictates that a lease with a put option is more valuable than the same lease without one.

FINDINGS OF FACT AND CONCLUSIONS OF LAW (DAMAGES PHASE)
C-03-02013

24

As the United States Supreme Court explained years ago: "Where defendant anticipatorily breaches, [plaintiff] had the right to elect to treat the contract as absolutely and finally broken by the defendant; to maintain this action, once for all, as for a total breach of the entire contract; and to recover all that he would have received in the future, as well as in the past, if the contract had been kept." *Pierce v. Tennessee C., I. & R. Co.*, 173 U.S. 1, 16 (1899). This rule now applies by statute to breaches of leases and entitles the non-breaching party to the full benefit of the lease. *See* Cal. Civ. Code § 1951.2. If First National could only recover for breach of the lease portion of the Agreement, it would not receive any compensation for the loss of its put option and, therefore, the full benefit of its bargain made with FRIT. Admittedly, if First National had chosen to exercise its put option during the term of the lease, that exercise would have cut off any further lease payments. However, it was FRIT's breach that took away First National's ability to choose when to exercise the put and FRIT should not benefit from that uncertainty. *See Zinn v. Ex-Cell-O Corp.*, 24 Cal. 2d 290, 297-8 (1944); *Macken v. Martinez*, 214 Cal.App. 2d 784, 790 (1963). Therefore, the appropriate measure of damages is the value of the put option on the date of breach plus the lease payments under the Agreement net of mitigation available.

No case supports the theory that First National's treatment of the repudiation as a breach has the effect of an exercise of the option. In fact, *Schmidt v. Beckelman*, *supra*, suggests otherwise. Beckelman in his cross-complaint in response to plaintiff's suit to void an option sought damages for loss of the option. Beckelman asked the trial court to award damages under Civil Code §3306 (which governs breaches by sellers of purchase and sale contracts). The trial court awarded such damages and the court of appeal reversed. However, the reversal was based upon the trial court's basing the damages on the statute providing damages for breach of an agreement to convey when there had been no election to exercise the option. Rather, the court stated:

> The true measure of damages would appear to be actual damages under the provisions of section 3300. An item of damage, of course, would be the value, not of the land itself, but of the conditional right to purchase the land, less the amount agreed to be paid. What this value was would be a factual matter for determination by the court under all the circumstances of the case. No evidence was here presented as to such value, nor was any offered or received.

United States District Court
For the Northern District of California

187 Cal. App. 2d at 471. Here, there was testimony on the factual question of the value of the put option. The fact that the difference between the option price and the fair market value of the property at the time of breach was considered does not render the finding of the value of First National's put option unreliable.

**D. New Things West Reimbursement**

**1. Buy-Out of Lease**

The Agreement calls for First National to be reimbursed $75,000 for the buy-out of the lease of New Things West. FRIT has not done so. Therefore, First National is entitled to be reimbursed $75,000.

**2. Prejudgment Interest**

The damages resulting from FRIT's failure to reimburse First National for the buy-out of the New Things West lease are certain and thus prejudgment interest is appropriately recovered by First National pursuant to Cal. Civil Code section 3287(a) in the amount of $59,178.

**E. Calculation of First National's Damages**

| | |
|---|---|
| Worth at the date of sale of the amount by which the rent due under the Agreement ($5,271,973) exceeds the amount of rent collected ($726,803) and loss that could have been avoided ($0.00). | $4,545,170 |
| Worth at the time of award of the amount by which the rent due under the Agreement from the date of sale to the time of award ($5,228,997) exceeds the amount of imputed rent collected ($2,958,904) and loss that could have been avoided ($0.00). | $2,270,093 |
| Prejudgment Interest on Lease Damages | $3,001,680 |
| Worth at the time of award of the amount by which the rent due under the Agreement for relet space from the time of award to the end of the lease ($1,627,843) exceeds the amount of imputed rent collected for that space ($846,027) and loss that could have been avoided ($0.00) discounted at the rate of 1.5% | $769,403 |
| New Things West Reimbursement | $75,000 |
| Prejudgment on New Things West Reimbursement | $59,178 |

| Put Value on May 11, 2001 ($13,333,333 (then current rent capitalized at 9%) minus $6,500,000 (fair market value of the Property on May 11, 2001) minus mitigation of $1,652,583). | $5,180,750 |
| --- | --- |
| **Total** | **$15,901,274** |

DATED: 6/8/09

RONALD M. WHYTE
United States District Judge

**United States District Court**
For the Northern District of California

FINDINGS OF FACT AND CONCLUSIONS OF LAW (DAMAGES PHASE)
C-03-02013
27

**United States District Court**
For the Northern District of California

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

Daven Gerald Lowhurst lowhurstd@howrey.com
Patrick Martin Ryan pryan@winston.com

**Counsel for Defendants:**

Nicholas B. Waranoff nwaranoff@allenmatkins.com
Marlene Moffitt mmoffitt@allenmatkins.com
William W. Huckins whuckins@allenmatkins.com
Mark Jeremy Seifert mseifert@allenmatkins.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:** 6/9/09

TER
**Chambers of Judge Whyte**