Patrick M. Ryan (CA Bar No. 203215)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA  94111-5894
Telephone:    415.591.1000
Facsimile:     415.591.1400
pryan@winston.com

Daven G. Lowhurst (CA Bar No. 124723)
HOWREY LLP
525 Market Street, Suite 3600
San Francisco, CA  94105-2708
Telephone:    415.848.3363
Facsimile:     415.848.4999
lowhurstd@howrey.com

Attorneys for Plaintiff,
FIRST NATIONAL MORTGAGE COMPANY

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| FIRST NATIONAL MORTGAGE COMPANY, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL REALTY INVESTMENT TRUST,<br><br>Defendant. | **Case No. C 03-02013 RMW (RS)**<br><br>**PLAINTIFF FIRST NATIONAL'S NOTICE OF MOTION AND MOTION FOR EXPENSES UNDER FED. R. CIV. P. 37(c)(2); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:          September 4, 2009<br>Time:          9:00 a.m.<br>Judge:         Hon. Ronald M. Whyte<br>Courtroom:   4th Floor, #6 |

Winston & Strawn LLP
101 California Street
San Francisco, CA  94111-5802

**TABLE OF CONTENTS**

I.   INTRODUCTION AND SUMMARY OF MOTION ...............................................2

II.  STATEMENT OF ISSUE PRESENTED ..........................................................4

III. FIRST NATIONAL SHOULD BE AWARDED THE EXPENSES SOUGHT
     BECAUSE THEY WERE INCURRED PROVING THE TRUTH OF MATTERS
     FRIT DENIED ...................................................................................................4

     A.   Rule 37(c)(2) Mandates the Relief Sought by this Motion...........................5

     B.   FRIT's Denial of RFA Nos. 1–7 Was Unreasonable....................................6

     C.   FRIT's Denial of RFA Nos. 10–11, Based on the 2005 Expert Opinion of
          Norman Hulberg, Was Unreasonable. ..........................................................9

     D.   FRIT's Denial of RFA No. 13 Was Unreasonable. .....................................13

     E.   First National Is Entitled To Recover Its Expenses Incurred In Proving that the
          Matters in RFA Nos. 1–7, 10–11, and 13, which FRIT Refused To Admit. ...............15

          1.   The Court Should Award First National $1,544,744.50 in Attorneys'
               Fees. ...................................................................................................16

          2.   The Amount of Fees Sought Is Reasonable..................................................19

     F.   The Court Should Award First National $364,615.95 in Expert-Witness Fees...........20

     G.   FRIT Should Reimburse First National for Other Expenses Incurred in
          Proving the Truth of the Responses that Were Denied................................22

IV.  CONCLUSION..................................................................................................23

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

-i-

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Centr. Valley Gen. Hosp. v. Smith,*
  162 Cal. App. 4th 501 (2008) ........................................................................................3, 15

*Cobell v. Norton,*
  231 F. Supp. 2d 295 (D.D.C. 2002) ........................................................................................16

*Davis v. City & County of San Francisco,*
  976 F.2d 1536 (9th Cir. 1992) ........................................................................................18

*Gates v. Deukmejian,*
  987 F.2d 1392 (9th Cir. 1983) ........................................................................................18

*Gold Mining & Water Co. v. Swinerton,*
  23 Cal. 2d 19 (1943) ........................................................................................3

*House v. Giant of Md., LLC,*
  232 F.R.D. 257 (E.D. Va. 2005) ........................................................................6, 15, 16, 20

*Marchand v. Mercy Med. Ctr.,*
  22 F.3d 933 (9th Cir. 1994) ........................................................................................5, 10, 15

*Mendenhall v. Nat'l Transp. Safety Bd.,*
  213 F.3d 464 (9th Cir. 2000) ........................................................................................17

*Milgram Food Stores, Inc. v. United States,*
  558 F. Supp. 629 (W.D. Mo. 1983) ........................................................................................5

*Missouri v. Jenkins,*
  491 U.S. 274 (1989) ........................................................................................18

*Naify v. Pac. Indemn. Co.,*
  11 Cal. 2d 5 (1938) ........................................................................................3

*Welch v. Metropolitan Life Ins. Co.,*
  480 F.3d 942 (9th Cir. 2007) ........................................................................................17, 18

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

**STATUTES**

California Civil Procedure Code § 998 ............................................................................4

**OTHER AUTHORITIES**

Fed. R. Civ. P. 37(c)(2) ........................................................................................... passim

Fed. R. Evid. 408 .......................................................................................................12

James Wm. Moore, 7 *Moore's Federal Practice* § 37.73 (Matthew Bender 3d ed. 2009) ...........16

Restatement of the Law Second, Contracts, § 253 .......................................................3

**Winston & Strawn LLP**
**101 California Street**
**San Francisco, CA 94111-5802**

**NOTICE OF MOTION AND MOTION FOR EXPENSES (RULE 37(c)(2))**

TO DEFENDANT AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on September 4, 2009, at 9:00 a.m. (a hearing date set at the request of, and to accommodate, counsel for Defendant Federal Realty Investment Trust ("FRIT")), or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Ronald M. Whyte, located at 280 South First Street, San Jose, California, Plaintiff First National Mortgage Company ("First National") will and hereby does move the Court for an order for expenses under Federal Rule Civil Procedure 37(c)(2).

This motion is brought on the grounds that FRIT denied First National's Request for Admission Nos. 1–7, 10–11, and 13, forcing First National to prove that the matters denied were, in fact, true.  Under Rule 37(c)(2) and relevant case law, unless FRIT can show that an exception to Rule 37(c)(2) applies, it is mandatory that First National be reimbursed its reasonable expenses incurred — including attorney's fees and expert-witness fees — in proving these matters.  As discussed below, FRIT cannot show that any of Rule 37(c)(2)'s exceptions apply and therefore the Court should award the expenses requested, *i.e.*, a portion of the fees and costs First National incurred from November 1, 2007, the date by which FRIT plainly should have known its denials were erroneous, through and including Judgment (June 9, 2009), in proving these matters.[1]  First National's request for expenses includes attorney's fees for its four core attorney time-keepers, expert-witness fees, and costs.  Together, the requested expenses total $1,932,811.93.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed declarations of Patrick M. Ryan, James Schratz, and Michael Rubenstein and exhibits thereto, the pleadings on file in this action, and on such other matters as may be presented at or before the hearing on this motion.

---

[1]     Although First National only requests expenses starting from November 1, 2007, the Court has the authority to award expenses from the date FRIT served its responses — August 31, 2007.  If the Court in its discretion awards expenses starting as of August 31, 2007, First National will supplement its submission to provide the Court with data for the time period August 31, 2007 through October 31, 2007.

-1-

Winston & Strawn LLP
101 California Street
San Francisco, CA  94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION AND SUMMARY OF MOTION

Where a responding party denies a request for admission and the requesting party proves that matter to be true, Federal Rule of Civil Procedure 37(c)(2) mandates that a court award expenses incurred by the requesting party in proving that matter unless the responding party can show that one of Rule 37(c)(2)'s exceptions applies.

As shown below, during the damages phase of this case, First National requested that FRIT admit matters of substantial importance to the Phase II trial such as causation (RFA No. 1), the amount of damages (RFA Nos. 2–7), the fair market value of the subject property (RFA Nos. 10–11), and the start date of the lease (RFA No. 13).  FRIT denied each of these requests.  At trial, First National was forced to prove that each matter denied was, in fact, true.  Because FRIT's refusal to admit key facts is not saved by any of Rule 37(c)(2)'s exceptions, First National is entitled to recover its expenses, including the attorney's fees and expert-witness fees First National was forced to incur in proving the denied matters.

But for FRIT's denials, a tremendous amount of time and expense would have been saved for the parties and the Court because the issues to be tried would have been greatly reduced, or indeed, trial could have been avoided all together.  Specifically, FRIT "denied" that First National was damaged at all (RFA Nos. 1–7), apparently based on the fact that FRIT disagreed with the jury verdict or a theory that the parties' contract was a unilateral contract that FRIT was free to revoke as it pleased, even while repudiating the contract.  As the Court found, this theory was both meritless and untimely, and FRIT had no reasonable ground to believe it might prevail on this theory.

In addition, FRIT denied that the fair market value of the property on May 11, 2001 was less than or equal to $8.5 million (or less than or equal to $6.5 million) (RFA Nos. 10–11), even though its appraiser used an appraisal method of "questionable reliability" at the behest of FRIT's counsel. As First National learned through discovery, at the express instruction of FRIT's counsel, FRIT's appraiser made several unsupportable assumptions and used data points remote in time to the operative date.  FRIT, having instructed its expert to use a flawed methodology, cannot be said to have reasonably relied on that flawed method in denying RFA Nos. 10–11.

-2-

PLAINTIFF FIRST NATIONAL'S NOTICE OF MOTION AND MOTION FOR EXPENSES; AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF (C 03-02013 RMW [RS])

FRIT also denied that the start date of the lease was May 11, 2001, even though such a denial lacked merit and the denial was raised two years after the Court found the start date to be May 11, 2001 (RFA No. 13).  After the liability phase of the trial, the jury found that FRIT repudiated the contract.  It has been black-letter law for decades, as FRIT became aware not later than 2005 when the issue was briefed, that a party's repudiation of a contract "discharges any remaining duties of performance of the other party."  *Centr. Valley Gen. Hosp. v. Smith*, 162 Cal. App. 4th 501, 520–21 (2008); *Gold Mining & Water Co. v. Swinerton*, 23 Cal. 2d 19, 29 (1943); *Naify v. Pac. Indemn. Co.*, 11 Cal. 2d 5, 10 (1938); Restatement of the Law Second, Contracts, § 253 ("one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance").  FRIT, therefore, had no reasonable ground to believe it might prevail on its denial of RFA No. 13.

The denial of RFA Nos. 1–7, 10–11, and 13 prevented First National from moving for early judgment and it forced First National to incur attorney and expert fees proving issues that should have been resolved by the responses.  For example, had FRIT admitted the $8.5 million valuation of the property, First National could reasonably have decided not to do additional work to prove a lower valuation, since it was always possible that the Court would offset the value of the sale (as mitigation) against put damages as it chose to do.  But it did not have the option to reduce expense by dong no further work on valuation of property as of May 11, 2001, because FRIT was arguing for a substantially higher valuation than what was stated in the RFA.  Since First National bore the burden of proof on proving put damages, First National could not take the risk of not countering FRIT's erroneous valuations no matter how facially flawed.  Highlighting that it would have been a rational decision for First National to not expend the additional attorney and expert fees needed to prove a fair market value lower than $8.5 million, the Court arrived at a May 2001 present value of the sale at $8,152,583.

Thus, because Rule 37(c)(2) mandates it and because but for the denials, substantial savings in time and money to the Court and First National First National could have been had, First National is entitled to recover expenses related to proving the matters FRIT refused to admit.  First National has limited its attorney's fees request to a portion of fees for four core time-keepers who billed time

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

between November 1, 2007 (two months after initial expert reports were submitted, the date by which FRIT should have plainly known its denials were erroneous) and June 9, 2009 (the date of the Judgment).  The total attorney's fees requested are $1,544,774.50, which is a small fraction of the total fees and expenses incurred by First National in this case, which approximate $4.5.  First National also has limited its request for expert fees to the same time period (November 1, 2007 – June 9, 2009) and seeks $364,615.95 in expert fees.[2]  Finally, First National seeks to recover costs for this time period in the amount of $23,421.48.  These expenses are reasonable, and awarding them is fair, just, and equitable.  Therefore, the motion should be granted.

## II.      STATEMENT OF ISSUE PRESENTED

Should the Court award First National the $1,932,811.93 in expenses it incurred in proving the truth of the matters FRIT denied in response to First National's requests for admission?

## III.     FIRST NATIONAL SHOULD BE AWARDED THE EXPENSES SOUGHT BECAUSE THEY WERE INCURRED PROVING THE TRUTH OF MATTERS FRIT DENIED

First National brought this action because FRIT breached "a 10-year lease of the office building and land located at 350 South Winchester Boulevard in San Jose California ("the Property")" and a "put option which gave [it] the right to require FRIT to purchase the Property during the lease term."  (Docket Entry ("DE") 713, Findings of Fact and Conclusions of Law (Damages Phase) ("Findings and Conclusions") at 1.)  The Court, upon stipulation of the parties, bifurcated the case into two phases — liability and damages.  (*Id.* at 2.)  The parties tried liability to a jury, and the jury found (among other things) that the document the parties refer to as the "Final Proposal" was an enforceable contract containing "put" and "call" options, and that FRIT anticipatorily breached it.  (*Id.*)  Following the jury verdict, the parties moved to the damages phase.

On or about August 1, 2007, First National served its First Request for Admissions to FRIT to dispose of, or at least substantially narrow, the issues to be presented and decided during Phase II

---

[2]      First National also seeks to recover these expert-witness fees under California Civil Procedure Code § 998 as set forth in its Motion for Partial Expert-Witness Fees filed concurrently herewith.  First National respectfully requests that, in addition to granting the Motion for Partial Expert-Witness Fees, the Court grant this motion as an independent basis for the award of the expert-witness fees claimed by this motion.  However, First National does not, by this motion, seek a double of recovery of the expert-witness fees also claimed in the Motion for Partial Expert-Witness Fees.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

of the trial.  (Ryan Decl., ¶¶ 3–4 & Ex. A [RFAs].)  On or about August 31, 2007, FRIT objected to

and denied RFA Nos. 1–7, 10–11, and 13.  (*Id.*, ¶ 5 & Ex. B [Responses to RFAs].)  When it served

its responses, FRIT knew or should have known that these denials were improper.  As the parties

progressed toward the trial on damages, FRIT obtained additional information confirming that all of

its denials were improper.  Yet FRIT never supplemented any of its RFA responses.  (*Id.*, ¶ 6.)

During Phase II, First National proved that the matters denied were, in fact, true.

**A.      Rule 37(c)(2) Mandates the Relief Sought by this Motion.**

Rule 37(c)(2) provides that "[i]f a party fails to admit what is requested under Rule 36 and if

the requesting party later proves . . . the matter true, the requesting party may move that the party

who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that

proof."  This rule "serves a specific function:  simplification of issues for trial, in order to eliminate

wasted trial time both for the litigants and the Court."  *Milgram Food Stores, Inc. v. United States*,

558 F. Supp. 629, 635 (W.D. Mo. 1983) (discussing a prior version of Rule 37).  For this reason,

"[p]arties may not view requests for admission as a mere procedural exercise requiring minimally

acceptable conduct."  *Marchand v. Mercy Med. Ctr.*, 22 F.3d 933, 936 (9th Cir. 1994).  Rather,

parties "should focus on the goal of the Rules, full and efficient discovery, not evasion and word

play."  *Id.*

Enforcement of Rule 37(c)(2) "encourages attorneys and parties to identify undisputed issues

early to avoid unnecessary costs" because it "mandates an award of expenses" unless the responding

party proves "(1) the request was held objectionable pursuant to Rule 36(a), or (2) the admission

sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to

believe that the party might prevail on the matter, or (4) there was other good reason for the failure

to admit."  *Id.* (citing Rule 37).[3]  As used in Rule 37(c)(2), the term "expenses" has a broad meaning,

including attorney's fees and "expert witness fees and other costs incurred in proving the truth of the

---

[3]     *Marchand* considered the version of Rule 37(c) in effect prior to December 1, 1993, but the
court noted that:  "[a]lthough the Rule was renumbered, the language remains unchanged."  22 F.3d
at 936 n.2.  Thus, *Marchand* and other case authority discussing earlier versions of Rule 37 remain
good law.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

matter." Federal Civil Procedure Before Trial (National Edition) ¶ 11:2118 (citing *Marchand*, 22 F.3d at 936; and *House v. Giant of Md., LLC*, 232 F.R.D. 257, 262 (E.D. Va. 2005)).

**B.     FRIT's Denial of RFA Nos. 1–7 Was Unreasonable.**

RFA No. 1 asked FRIT to admit that its breach of the Final Proposal proximately caused First National damage.  RFA Nos. 2–7 asked FRIT to admit that First National suffered damages in excess of several stated amounts due to FRIT's breach.  Specifically, First National asked FRIT to admit:

1.     First National Mortgage Company suffered damages proximately caused by Federal Realty Investment Trust's breach of the Final Proposal.

2.     First National Mortgage Company suffered damages in excess of $1,999,000 proximately caused by Federal Realty Investment Trust's breach of the Final Proposal.

3.     First National Mortgage Company suffered damages in excess of $2,999,000 proximately caused by Federal Realty Investment Trust's breach of the Final Proposal.

4.     First National Mortgage Company suffered damages in excess of $3,999,000 proximately caused by Federal Realty Investment Trust's breach of the Final Proposal.

5.     First National Mortgage Company suffered damages in excess of $4,999,000 proximately caused by Federal Realty Investment Trust's breach of the Final Proposal.

6.     First National Mortgage Company suffered damages in excess of $5,999,000 proximately caused by Federal Realty Investment Trust's breach of the Final Proposal.

7.     First National Mortgage Company suffered damages in excess of $6,999,000 proximately caused by Federal Realty Investment Trust's breach of the Final Proposal.

(Ryan Decl., Ex. A [RFAs].)  The purpose of these RFAs was to allow FRIT to select the most accurate amount of damages it was willing to admit that it had caused First National, thereby giving First National a means to resolve Phase II early without the need protracted, expensive, and time-consuming litigation and trial.  (Rubenstein Decl., ¶ 9; Ryan Decl. ¶ 3.)

FRIT denied all of these RFAs with the identical response:

Federal Realty objects to the request as compound.  Additionally, Federal Realty objects to the request as calling for expert opinion prior to the deadline for expert disclosures; additionally, non-expert

Winston & Strawn LLP
101 California Street
San Francisco, CA  94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

> discovery on damages issues (e.g., the deposition of First National and Michael Rubenstein) has not been completed, expert report s have not been prepared, and the Court has not ruled on various legal issues that could impact damage issues; therefore Federal Realty cannot admit or deny the request.  Additionally, Federal Realty objects to the request to the extent that it requires an admission as to a question of law as to election of remedies, which prevents Federal Realty being able to respond to the request, and on that basis, Federal Realty denies the request.  Furthermore, while the jury returned a verdict in favor of First National during Phase I of the case that Federal Realty breached the Final Proposal, Federal Realty believes that the determination will be reversed on appeal, and that there was no breach by Federal Realty or resulting damages suffered by First National. On this basis, Federal Realty denies the request.  Additionally, Federal Realty is without sufficient information to determine whether First National suffered any legally compensable damages, even if there was such a breach, because, among other things, First National failed to exercise reasonable efforts to mitigate the consequences of any alleged breach. On this additional basis, Federal Realty denies the request.

(Ryan Decl., Ex. B [Response to RFAs].)

FRIT cannot meet its burden of proving that its wholesale refusal to admit these matters falls within an exception to Rule 37(c)(2).  First, FRIT failed to obtain a court order sustaining its objections to these RFAs and therefore its objections are irrelevant. Fed. R. Civ. P. 37(c)(2)(A). Further, even if FRIT's objections relating to expert discovery were well-taken at the time (and as explained below, they were not), once expert reports had been served, FRIT was obligated under Rule 26 to supplement its responses, but it never did.  (Ryan Decl., ¶ 6.)

Second, these RFAs were of substantial importance.  After the Phase I trial, FRIT's liability was established.  The purpose of Phase II was to try causation and damages.  Because RFA Nos. 1–7 seek admissions about damages, these RFAs were of substantial importance to the Phase II trial.  As explained by Michael Rubenstein (Vice Chairman of First National), First National's litigation expenses as of August 2007 totaled approximately $2 million.  (Rubenstein Decl., ¶ 10.)  While pleased by the Phase I verdict, Mr. Rubenstein and his business partner, Hal Dryan, "were both exhausted by FRIT's tactics."  (Id., ¶ 6.)  The litigation costs of this case also "were becoming overwhelming" for the two principals.  (Id.)  Mr. Rubenstein authorized counsel to serve the First Set of RFAs "hop[ing] that FRIT would admit an amount that would be sufficiently high that [First National] could simply take judgment on that amount and, thus, cut-off the need to go to trial to prove damages."  (Id., ¶ 9.)  FRIT's denials of these RFAs — which provided FRIT with several

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    alternative damages amounts for FRIT to choose to admit — foreclosed any possibility of ending

2    this litigation short of a full damages trial.

3          Third, FRIT had no reasonable ground to believe that it might prevail on its denial of RFA

4    Nos. 1–7.  FRIT "denied" each of the RFAs for three reasons that were meritless and perhaps even

5    nonsensical.  (Ryan Decl., Ex. B [Response to RFAs].)  What appears to have been driving FRIT's

6    denials was its position that First National suffered no damages because the jury got it wrong or

7    because of an erroneous defense to liability that it never raised during Phase I.

8          During Phase II, FRIT argued that First National was "not entitled to any damages" "because

9    the lease was to commence on the date First National vacated" and "[s]ince that date was in the

10   exclusive control of First National, . . . the contract was a unilateral one that FRIT revoked before

11   First National vacated, that the contract lacked consideration and that the contract was illusory."

12   (DE 713, Findings and Conclusions, at 16.)  The Court roundly rejected this position because:

13   "FRIT's argument is untimely and without merit."  (*Id.* at 15.)  As this Court explained:  "Questions

14   of liability were raised and decided in Phase I by a jury and FRIT made no contention that the

15   contract was unilateral, lacked consideration or was illusory. The jury found that there was a lease

16   and that FRIT breached it.  Not only has FRIT already lost on liability, raising the issue for the first

17   time now would be unfair to First National."  (*Id.*)

18         FRIT's denials of RFA Nos. 2 and 3 also were unreasonable because even had FRIT

19   prevailed on its election-of-remedies argument, First National would have recovered more than the

20   figures identified in the denied requests ($1,999,000 in RFA No. 2 and $2,999,999 in RFA No. 3).

21   During the damages phase of the trial, FRIT's own economic expert (Paul Meyer) opined that lease

22   damages alone would range from $3,200,000–$8,259,280, depending on how the Court resolved

23   certain legal and factual issues.  (Ryan Decl., Ex. C [Phase II Trial Ex. 2055.006-R through

24   2055.011-R].)[4]  Also, during the damages phase of the trial, FRIT's own appraiser (Norman

---

25

26   [4]      Mr. Meyer changed his opinion about First National's damages the day before he was
     scheduled to testify at trial.  His original opinion assumed that the lease was a gross lease because
     FRIT's counsel asked him to make that assumption.  (Ryan Decl., Ex. E at 119:16–24; 122:19–123:1
27   [Meyer Deposition Transcript].)  At trial, FRIT presented no evidence that the lease was a gross
     lease and the Court found that "under the circumstances, the lease payments as described in the
28   Agreement can only be reasonably interpreted as triple net rent.  (DE 713, Findings and Conclusions,
     at 7:22–23.)

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   Hulberg) opined that put damages alone could range from roughly $220,000 to $3.8 million, values

2   derived from subtracting the fair market value of the subject property as of May 11, 2001 — which

3   Hulberg opined was between $9.5 million and $13.11 million — from the put option price on May

4   11, 2001 ($13,333,333).  (Ryan Decl., Ex. I at 12:12–13:2 [Hulberg January 25, 2008 Deposition

5   Transcript].)  Based on these opinions, the best-case scenario for FRIT under its election-of-

6   remedies theory was that First National would recover $3.2 million.  Therefore, FRIT had no

7   reasonable ground to deny RFA Nos. 2 or 3, and certainly not both, nor did it have any good reason

8   for its failure to admit that First National's damages were at least $2,999,000.

9   **C.   FRIT's Denial of RFA Nos. 10–11, Based on the 2005 Expert Opinion of Norman**

10   **Hulberg, Was Unreasonable.**

11   RFA Nos. 10 and 11 sought to establish the value of the subject property as of the date FRIT

12   breached the Final Proposal.  First National asked FRIT to admit:

13   10.   The value of the subject property (350 South Winchester
      Boulevard, San Jose) as of May 11, 2001 was less than or equal
14   to $6,500,000.

15   11.   The value of the subject property (350 South Winchester
      Boulevard, San Jose) as of May 11, 2001 was less than or equal
16   to $8,500,000.

17   (Ryan Decl., Ex. A [RFAs].)  FRIT responded to RFA No. 10 as follows:

18   Federal Realty objects to the request as vague and ambiguous as to the
      phrase "value of the subject property;" value can mean numerous
19   things under a variety of circumstances and assumptions, including in-
      place value , in-use value, replacement value, value based on sales of
20   comparable properties, fair market value, value based on highest and
      best use, and value as what; Federal Realty objects to the request as
21   compound; additionally, Federal Realty objects to the request as
      calling for expert opinion prior to the deadline for expert disclosures.
22   Notwithstanding and subject to the foregoing objections, based on the
      July 2005 report of Norman Hulberg, the fact that First National
23   rejected purchase offers in excess of *$6.5 million*, and the subject
      property was sold for $10 million plus additional consideration,
24   Federal Realty denies the request.

25   (Ryan Decl., Ex. B, emphasis added [Response to RFAs].)  But for one detail — the reference to the

26   amount — FRIT's responses to RFA No. 11 was identical.  (*Id.*)

27   Again, FRIT cannot meet its burden of proving that its wholesale refusal to admit these

28   matters falls within an exception to Rule 37(c)(2).  First, FRIT failed to obtain a court order

-9-

1  sustaining its objections to these requests and therefore its objections are irrelevant.  Fed. R. Civ. P.

2  37(c)(2)(A).  Further, FRIT's objection that the phrase "value of the subject property" was vague

3  and ambiguous does not comport with FRIT's obligations under Rule 36, since FRIT was bound to

4  "focus on the goal of the Rules, full and efficient discovery, ***not evasion and word play***."

5  *Marchand*, 22 F.3d at 936 (emphasis added).  Further, even if FRIT's objections relating to expert

6  discovery were well-taken at the time (and as explained below, they were not), once expert

7  disclosures and discovery had occurred, FRIT was obligated under Rule 26 to supplement its

8  responses, but it never did.  (Ryan Decl., ¶ 6.)

9       Second, the market value of the subject property was a matter of substantial importance to

10  the damages trial because it, in effect, established the put damages.  As the Court explained, First

11  National's damages for the loss of the put is the put option price minus the fair market value of the

12  subject property as of May 11, 2001.  (DE 713, Findings and Conclusions, at 13–14.)

13       Both of the parties were well-aware that one of the biggest expenses related to the trial of

14  Phase II would be attorney and expert expenses related to appraising the property's market value on

15  May 11, 2001.  (Rubenstein Decl., ¶ 8; Ryan Decl, ¶ 3.)  First National, therefore, sought admissions

16  as to the fair market value of the property, hoping to obviate the need for further attorney and expert

17  appraisal work to prove the property's market value.  (*Id.*)  Because FRIT insisted that the market

18  value of the subject property was much higher than that stated in RFA Nos. 10 and 11, First National

19  had no choice but to incur substantial attorney time and expert appraisal fees to meet its burden of

20  establishing the market value of the subject property as of May 11, 2001.  (*Id.*)

21       Third, FRIT had no reasonable ground to believe that it might prevail on its denial of RFA

22  Nos. 10–11.  FRIT denied the RFAs "based on the July 2005 report of Norman Hulberg, the fact that

23  First National rejected purchase offers in excess of $6.5 million [and $8.5 million], and the subject

24  property was sold for $10 million plus additional consideration."  (Ryan Decl., Ex. B [Response to

25  RFAs].)  In his 2005 expert report, FRIT's appraiser (Norman Hulberg) incorporated data points

26  from 2004 and 2005, including the price of the subject property on the date it was sold in 2005 (DE

27  713, Findings and Conclusions at 14:6–7), "an offer by First National to sell the building in late

28  2004 for $10,000,000 which was not accepted" (*id.* at 14:4–5); and "an admitted guesstimate" by

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

-10-

First National's principal Mr. Dryan that in 2004, the subject property was worth approximately $8.5 million.  (*Id.* at 14:5–6).

Mr. Hulberg assumed that these data points were accurate representations of the property's value at FRIT's counsel's instruction and, also, at FRIT's counsel's instruction, took these data points and attempted to go back in time to arrive at value in May 2001.  (Ryan Decl., Ex. G at 861:4–23; 862:23–863:5 [Phase II Trial Testimony] [Hulberg admits that he used 2004/2005 data points as value assumptions because he was instructed to do so by FRIT's counsel]; *Id.*, Ex. F [Trial Ex. No. 1086.002, 1086.033–034] [showing that the methodology employed by Mr. Hulberg to take assumed values in 2004 and go back in time to May 2001 was at FRIT's counsel's instruction].)  Also, at the time of his report, which FRIT used to justify its denials, Mr. Hulberg admitted that he did not use the sales comparison approach to arrive at his value, though later at trial he testified that comparative sales corroborated his opinions.  (Ryan Decl., Ex. F [Trial Ex. No. 1086.003, ¶ 1 ["I did not apply the Sales Comparison and Income approaches to value.  Rather, I focused on historic pricing over time, with the anchor being the indications of value given by the property owner."].)  Thus, what is clear is that FRIT's counsel was only relying on itself when it denied the RFAs, because its expert was only doing exactly what he was told by FRIT, and those instructions were not reasonable.

By 2007, FRIT clearly knew that using 2004/2005 data points to go back in time to value property in 2001, which FRIT's counsel had ordered its appraiser to do, was not reasonable.  Indeed, at his December 2007 deposition, with FRIT's lead counsel present, FRIT's Chief Executive Officer, Don Wood, who had 10 years of experience in the real estate industry, agreed that it is "***impossible for anybody***" to accurately take a value in 2004 or 2005 and go back in time to arrive at a 2001 property value, but yet that is exactly what FRIT's counsel instructed its appraiser to do, and that is the sole basis for FRIT's denial of the RFAs.  (Ryan Decl., Ex. J at 113:14–116:2 [Wood Deposition Transcript] (emphasis added).)

As this Court found, FRIT's appraiser "used a method of calculation of ***questionable reliability***" (DE 713, Findings and Conclusions, at 14, emphasis added) in that:

> [Hulberg's] opinion included consideration of two data points from
> 2004 which do not appear to be useful data points on which to base a

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1
2
3
4

> reliable appraisal:  (1) an offer by First National to sell the building in late 2004 for $10,000,000 which was not accepted and (2) an admitted "guesstimate" by Dryan in 2004 that the property was worth about $8,500,000.  Hulberg also considered the $10,000,000 sale by First National to Raissi in 2005.  Adjusting a sale in 2005 to reach an estimate of the Property's value in 2001 seems problematic, particularly in a volatile market as existed here.

5   (*Id.*)  FRIT cannot hide behind an erroneous expert methodology, which it instructed its expert to

6   employee, to avoid its responsibility to properly answer RFAs.

7          Additionally, when FRIT denied these requests, it was well-aware that the value of the

8   Property in May 2001 was approximately $6.5 million.  Shortly after FRIT breached the Final

9   Proposal, FRIT, attempting to induce First National to sell the property at a price much lower than

10  the first-year put-option exercise price ($13.33 million), represented that it had reviewed the current

11  condition of the office market in San Jose in mid-2001, that FRIT had looked at a variety of market

12  data (fair market value, rental rate trends, vacancy rates, tenant improvements, etc.) and that First

13  National's sale price "was way out of line with current values."  (Ryan Decl., Ex. K [Phase I Trial

14  Ex. 45].)[5]  Indeed, FRIT informed First National that ***FRIT had actually determined the value of***

15  ***the property to be no more than $6.5 million in mid-2001***.  (*Id.*)

16         Thus, ***six years*** before First National served the RFAs, FRIT knew that as of the approximate

17  date of breach, the market value of the Property was $6.5 million.  Due to this representation — as

18  well as representations about FRIT's expertise in valuing real property — First National relented to

19  FRIT's requests that First National keep its property unencumbered by long-term leases, and enter

20  into only short-term leases, so as to be able to transfer the property to FRIT if and when a new deal

21  could be struck.  (Ryan Decl., Ex. L at 269:23–298:12; 300:25–301:19; 487:17–488:18; 687:1–

22  687:25 [Phase I Trial Transcript]; *id.*, Ex. M [Phase I Trial Ex. 143]; *id.*, Ex. K [Phase I Trial Ex.

23  45].)  Indeed, this Court found that First National "reasonably relied on FRIT's representations and

24

25  _____
   [5]      Trial Exhibit 45 was admitted without objection during the Phase I trial.  (DE 637 15:2–5 [quoting Phase I trial transcript of admission of Exhibit 45 without objection].)  In Phase II, the

26  Court limited its use on 408 grounds to show First National's reliance on certain statements.  First National also properly relied on Trial Exhibit 45 in its brief on prejudgment interest.  Phase I Trial

27  Exhibit 45 – as well as other settlement communications – is admissible here.  It is not being offered to prove "liability for or invalidity of the claim or its amount" (Fed. R. Evid. 408), but rather to show

28  that FRIT knew that the value of the property did not exceed $6.5 million and therefore that its denial of the requests for admission was unreasonable.

-12-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1  requests in deciding on how best to mitigate damages, including the fact that First National primarily

2  sought short-term tenancies initially."  (DE 713, Findings and Conclusions, at 8:1–6.)  FRIT

3  nevertheless denied both RFA Nos. 10 and 11.  Based on FRIT's prior conduct and representations

4  to First National, FRIT should be estopped from now contending that it had no reasonable idea what

5  the market value of the property was in mid-2001.

6       Knowing the flaws in its own expert's opinion, because it created them, and having estimated

7  the property's value at $6.5 million years before the litigation began, FRIT should have admitted

8  RFA Nos. 10 and/or 11 (or at least supplemented its responses after the parties served their initial

9  expert reports).  FRIT had no reasonable basis on which to believe that it might prevail on these

10  issues, *i.e.*, no basis to think it could prove the property's value was greater than $8.5 million as of

11  May 11, 2001.  By standing on its denials, FRIT wasted the Court's time in hearing evidence and

12  resolving the issues, and forced First National to spend significant time and expense proving the fair

13  market value of the property.  Had FRIT admitted either RFA No. 10 or 11, First National could

14  have reasonable decided that it did not need to do any further expert valuation work in preparation

15  for the damages phase of the trial, because, given the possibility that the July 2005 sale might be

16  offset against the put price as mitigation, establishing a valuation under $8.5 would have provided

17  little utility.  But FRIT's denial and insistence on valuations that were to the moon — $9.5–$13.11

18  million — forced First National, the party with the burden of proof, to incur the expense of proving a

19  lower fair market value.

20       First National's request for expenses beginning in November 2007 is exceedingly reasonable

21  given that, by then, FRIT plainly should have supplemented its responses to admit that the fair

22  market value was no greater than $8.5 million.

23  **D.**     **FRIT's Denial of RFA No. 13 Was Unreasonable.**

24       RFA No. 13 asked FRIT to admit:

25       13.  The start date of the lease in the Final Proposal is May 11, 2001.

26  (Ryan Decl., Ex. A [RFAs].)  FRIT responded:

27       Federal Realty objects to this request on the ground that this issue was
   ruled on by the Court's Order Granting in Part and Denying in Part
   Cross-Motions In Limine on Damages Issues, entered on September

28       12, 2005.  Federal Realty further objects on the grounds that the

-13-

1

2

3

4

5

6

request is made for an improper purpose, to harass and to cause the needless increase in the cost of the litigation.  Furthermore, the Order Granting in Part and Denying in Part Cross-Motions In Limine on Damages Issues, entered on September 12, 2005, is interlocutory.  As such, Federal Realty cannot admit or deny the request. Furthermore, the request assumes that the Final Proposal was a binding ground lease and while the jury returned a verdict in favor of First National during Phase I of the case, Federal Realty believes that the determination will be reversed on appeal, and that the Final Proposal was not a binding contract. On this basis, Federal Realty denies the request.

7

(Ryan Decl., Ex. B [Response to RFAs].)

8

9

10

Again, FRIT has no basis to avoid application of Rule 37(c)(2).  First, having never sought a court ruling as to the validity of its objections, FRIT has no basis to raise its objections now.  Fed. R. Civ. P. 37(c)(2)(A).

11

12

13

14

15

Second, the start date of the lease was of substantial importance both with respect to the calculation of damages and as to the calculation of prejudgment interest.  When the lease began had a major impact on the amount of lease damages because a later start date would push more damages into the post-sale and post-award periods, which would have reduced First National's rent damages and significantly reduced the amount of pre-judgment interest on that claim.

16

17

18

19

20

Third, FRIT had no reasonable ground to believe that it might prevail on its denial of RFA No. 13.  FRIT denied RFA No. 13 on a single ground:  it "believe[d] that the determination will be reversed on appeal, and that the Final Proposal was not a binding contract."  (Ryan Decl., Ex. B [Response to RFAs].)  It is patently unreasonable for a party to avoid its duty to admit matters by the simple expedient of claiming it will reverse an unfavorable ruling on appeal.

21

22

23

24

25

26

27

28

Although FRIT never supplemented its response, which alone is fatal to any attempt by FRIT to assert a new basis to avoid cost shifting under Rule 37(c)(2), at trial it relied on an additional ground:  that the start date of the lease was January 1, 2002.  But the Court ruled by its September 12, 2005 order that "May 11, 2001 should probably be considered the lease commencement date for calculating damages."  (DE 330 at 4.)  The Court stated that it would "consider further argument if the parties disagree on this point."  (Id.)  For more than two years after the September 12 2005 Order, FRIT never disagreed with the Court that the start date is May 11, 2001.  Rather, FRIT waited to address this issue with the Court for the first time four months after serving its RFA responses.

Winston & Strawn LLP
101 California Street
San Francisco, CA  94111-5802

-14-

1       In its Findings and Conclusions, the Court ruled that "[s]ince FRIT anticipatorily breached

2  the Lease, the requirement that First National vacate the premises to start the Lease was discharged."

3  (DE 713, Findings and Conclusions at 17:27–18:1.)  Therefore, it found that "as of the date of the

4  anticipatory breach, First National was entitled to treat the lease as having commenced," *i.e.*, May

5  11, 2001.  (*Id.* at 6.)

6       As the Court pointed out in its Findings of Fact and Conclusions of Law, it is black-letter law

7  in California is that a party's repudiation of a contract "discharges any remaining duties of

8  performance of the other party with respect to the expected exchange."  (DE 713, Findings and

9  Conclusions at 17–18, quoting *Centr. Valley Gen. Hosp. v. Smith*, 162 Cal. App. 4th 501, 520–21

10  (2008).)  FRIT was well aware of this rule of law from numerous briefs filed in this case.  (*See*

11  Section I above.)  Further, the Court held that it was erroneous for FRIT to rely on the March 26,

12  2001 letter from First National offering to extend the start date if FRIT reimbursed it for lost rent

13  because FRIT's only response to that letter was to repudiate the Final Proposal.  (DE 713, Findings

14  and Conclusions at 5–6.)  Thus, FRIT had no reasonable basis or other good reason to believe that it

15  would succeed on its contention the lease start was anything other than May 11, 2001.  Nevertheless,

16  FRIT insisted on requiring First National to present evidence and argument regarding the start date

17  of the lease, all of which would have been unnecessary had FRIT admitted RFA No. 13.

**E.**    **First National Is Entitled To Recover Its Expenses Incurred In Proving that the**

       **Matters in RFA Nos. 1–7, 10–11, and 13, which FRIT Refused To Admit.**

20       Where, as here, the responding party improperly denies a request for admission and cannot

21  prove any of Rule 37(c)(2)'s exceptions apply, Rule 37(c)(2) "mandates an award of expenses" to

22  the requesting party.  *Marchand*, 22 F.3d at 296.  Rule 37(c)(2) expressly provides that such an

23  award includes attorney's fees (Fed. R. Civ. P 37(c)(2)) and "expert witness fees and other costs

24  incurred in proving the truth of the matter" (Federal Civil Procedure Before Trial (National Edition)

25  ¶ 11:2118, citing *Marchand*, 22 F.3d at 936; and *House*, 232 F.R.D. at 262).  As discussed below,

26  the Court should award First National expenses in the amount of $1,544,774.50 for attorneys' fees,

27  $364,615.95 for expert-witness fees, and $23,421.48 in costs; $1,932,811.93 in total.  Additionally,

28  the Court should award any costs, itemized in the First National Bill of Costs (DE 720) and

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

-15-

associated with Phase II during the relevant time period (*i.e.*, after November 1, 2007) that are deemed not recoverable by the Clerk of the Court. Also, the Court should award certain miscellaneous costs identified below, all of which were associated with Phase II after November 1, 2007 and are not recoverable as costs under Rule 54.

**1.    The Court Should Award First National $1,544,744.50 in Attorneys' Fees.**

"The proper method of awarding attorneys' fees for a violation of Rule 37 is the lodestar method, in which the court multiplies a reasonable hourly rate by a reasonable number of hours expended." *Cobell v. Norton*, 231 F. Supp. 2d 295, 300 (D.D.C. 2002). The moving party must show that "but for" the Rule 37 violation, it would not have expended the fees it seeks to recover. As discussed below, First National's calculation of the number of hours expended and the hourly rates are reasonable, and these expenses would not have been incurred but for FRIT's denials of these RFAs. Thus, the Court should award First National expenses for attorneys' fees in the amount of $1,544,744.50.

**(a)    The number of hours expended was reasonable.**

To calculate hours expended on proving matters FRIT denied, First National used time records for four of its core billing attorneys (Micaél Estremera, Brian P. Hennessey, Daven G. Lowhurst, and Patrick M. Ryan) for the time period November 2007 through June 2009, inclusive. (Ryan Decl., ¶¶ 16–19.) Counsel for First National then reviewed the billing records to remove any entry not related to proving the matters FRIT denied in RFA Nos. 1–7, 10–11, and 13. (*Id.*, ¶ 21; *cf.*, James Wm. Moore, 7 *Moore's Federal Practice* § 37.73 (Mathew Bender 3d ed. 2009) ("In determining the magnitude of the expenses that the failure to admit caused the propounding party to suffer, courts must look for a sufficient causal nexus between the expenses claimed and the failure to admit.").[6] First National removed entries for what could be characterized as excessive conferencing, and where more than one attorney attended a deposition and did not participate in the examination.

_____

[6]    There appears to be no Ninth Circuit authority discussing whether a party making a motion under Rule 37(c)(2) can recover fees related to the motion. Some non-Ninth-Circuit authority states the movant cannot. *E.g.*, *House*, 232 F.R.D. at 261-62. To the extent the Court determines it does not have the authority to award fees associated with seeking fees, a further disallowance of $93,313 (historic), $99,570 (current) may be warranted, because that is the amount of fees, if entire time entries are disallowed, where the issues of an attorneys' fees recovery is mentioned in the narrative.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

(Ryan Decl., ¶¶ 24–26.)  For example, First National's counsel removed from the Compendium time entries for multiple attendance at deposition, which amounted to 31.1 hours.  (Ryan Decl., ¶¶ 24–26.)  This equates to a reduction of $6,180.00 using historic standard rates and $9,177.50 using current rates.  (*Id.*)  Counsel also removed time entries for excessive conferencing, which amounted to 34.3 hours.  (*Id.*, ¶ 26.)  This equates to a reduction of $8,817.50 using historic standard rates and $8,937.50 using current standard rates.  (*Id.*)

After First National calculated the reduced number of hours expended on proving the matters FRIT denied, it retained James Schratz and Associates (a top auditing firm that specializes in auditing legal fees) to audit the calculations (and the compendium of attorneys' fees), to recommend the amount of fees allowable, and to provide an opinion on the reasonableness of the rates. (*Id.* ¶ 12.)  The audit was conducted by Mr. Schratz himself, who has personally supervised or conducted approximately 1,000 legal fee audits throughout the country.  (Schratz Decl. ¶¶ 5, 14.)  As part of the audit, Mr. Schratz reviewed the compendium of attorney's fees of the four core time-keepers prepared by First National's counsel.  (*Id.* ¶ 12; Ryan Decl., Ex. P [Compendium].) Mr. Schratz also reviewed the discovery requests and responses and compared them to the billing entries and reviewed some of the pleadings in the case related to Phase II.  (*Id.*)  Mr. Schratz also familiarized himself with the fact that First National had self-audited the fee request.  (*Id.*, ¶ 28.) Mr. Schratz found that First National's approach of first self-auditing the number of hours worked and the attorneys' billing rates and disallowing certain time entries "to be reasonable and indeed conservative."  (*Id.*)  In his opinion, the number of attorney hours spent on proving the matters FRIT denied were appropriate.  (*Id.*, ¶ 49.)  He also opined that the attorneys' standard rates (whether current or historical) were reasonable.  (*Id.*, ¶ 50.)  Therefore, the "reasonable hours" component of the lodestar calculation should be:  3,418.40.  (Ryan Decl., Ex. Q.)

**(b)      Counsel's current hourly rates are reasonable.**

"[T]he determination of a reasonable hourly rate 'is not made by reference to the rates actually charged . . . .'"  *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 946 (9th Cir. 2007) (quoting *Mendenhall v. Nat'l Transp. Safety Bd.*, 213 F.3d 464, 471 (9th Cir. 2000)).  "Rather, billing rates 'should be established by reference to the fees that private attorneys of an ability and

-17-

reputation comparable to that of prevailing counsel charge their paying clients for legal work of similar complexity.'" *Id.* (quoting *Davis v. City & County of San Francisco*, 976 F.2d 1536, 1545 (9th Cir. 1992).

Where, as here, there has been a delay in payment caused by the length of the litigation, the relevant hourly rate is counsel's current rates. *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989) (the lodestar rate should factor in an adjustment for "delay in payment"). The rationale behind such additional compensation is that "compensation received several years after the services were rendered . . . is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed . . . ." *Id.* at 283. "District courts have the discretion to compensate plaintiff's attorneys for a delay in payment by either applying the attorneys' current rates to all hours billed during the course of the litigation or using the attorneys' historical rates and adding a prime rate enhancement." *Welch*, 480 F.3d at 947.

Where there is a delay and the fees are high, the Ninth Circuit regularly upholds fee awards where the lodestar is calculated using current rates. *Gates v. Deukmejian*, 987 F.2d 1392, 1406–07 (9th Cir. 1983) ("the length of the delay in payment is a consideration in deciding whether an award of current rather than historic rates is warranted"). In *Gates*, the defendants argued that a three-year delay was too short to justify a current-rates award. *Id.* at 1407. The Ninth Circuit found this argument "unconvincing," and it stated that the three-year delay was "particularly onerous given that the fees awarded in this case, even without the 2.0 multiplier, runs in the millions of dollars." *Id.*

First National requests that the Court use current rates to calculate attorney's fees for counsel who remain in the private sector, and use the historic standard rates for counsel who now work in the public sector. Doing so is fair, because FRIT had the use of First National's money, made a substantial profit from that use, during which First National suffered harm and was forced to expend a total of approximately $4.5 million in fees and expenses during the course of this litigation. (Rubenstein Decl., ¶ 10.)

In short, while FRIT substantially benefited from having First National's money, First National was suffering severe financial hardship. Messrs. Rubenstein and Dryan were forced to (1) sue FRIT; (2) spend a substantial amount of their time and energy attempting to mitigate their

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

damages; (3) prematurely down-size their business and lay off long-time employees; (4) spend approximately $4.5 million in fees and expenses fighting against a powerful, well-funded, and aggressive adversary that vigorously litigated this case at every turn; and (5) spend eight valuable years of their lives — at an age when their time is especially precious — fighting a litigation behemoth for what was rightfully bargained for in the first place.  (DE 706, Rubenstein Decl. in Support of Prejudgment Interest Brief, ¶¶ 4, 9–11.)  Put simply, fairness dictates that the Court should calculate the lodestar based on current rates.

The current fees requested are well within market rates.  (Schratz Decl. ¶¶ 31–33, 38–39.) The current standard rates for these attorneys at their law firms are:  Mr. Lowhurst, $530; Mr. Ryan, $550; and Mr. Hennessy, $425.  (*Id.* ¶ 40.)  Mr. Estremera is now a Santa Clara County Assistant Public Defender, so First National seeks his historic standard rate.  (Ryan Decl., ¶ 32.)  Mr. Schratz opines that these rates are consistent with private attorneys of a similar ability, reputation, firm size for their paying clients for legal work of similar complexity.  (Schratz Decl., ¶¶ 31–39.)  Indeed, counsel's current rates are in line with those of counsel for FRIT as of September 2007.  (DE 533-1, FRIT's Motion for Sanctions, ¶ 2 [as of nearly two years ago, "[t]he hourly rate charged to Federal Realty" Nicholas B. Warnoff's time was "in excess of $500" and "[t]he hourly rate charged to Federal Realty for [associate] Ms. Moffitt's work" was "in excess of $300"].)

### 2.   The Amount of Fees Sought Is Reasonable.

As explained in the Schratz and Ryan declarations, the amount of attorney's fees sought is reasonable.  During the relevant period, lead counsel for First National wrote-off $49,638.82 in fees for excessive staffing.  (Ryan Decl., ¶ 18.)  First National also chose not to seek fees for 19 of the 23 time-keepers who billed time on this case between November 1, 2007 and June 9, 2009.  (*Id.*, ¶ 19.) Using historical standard rates, that time is worth $187,566.45.  (*Id.*)  First National also self-audited its time entries and decreased its fee request for the four core time-keepers for multiple attorney attendance at depositions ($9,177.50 using current standard rates and $6,180 using historic standard rates) and for excessive conferencing ($8.937.50 using current standard rates and $8,817.50 using historic standard rates).  (*Id.*, ¶¶ 24–26.)  Thus, First National is not seeking approximately $200,000 of fees, using historic standard rates, that it could under Rule 37(c)(2).

-19-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Moreover, the fees requested highlight that First National's request pertains directly to matters related to the RFAs FRIT denied.  For example, as explained above, FRIT's denials required First National to incur significant fees preparing its witnesses for deposition and taking the depositions of FRIT's witnesses.  Twelve percent (12%) of the expenses requested by this motion was incurred taking and defending depositions during the relevant period.  (*Id.* ¶ 23)  Another 31% of the expenses related to First National's April 2008 trial preparation and the week-long Phase II trial, which also occurred in April 2008.  (*Id.*)  In short, 43% of the expenses requested relate to one of three tasks — depositions, near-in-time trial preparation, and trial — which highlights the reasonableness of First National's request.

**F.     The Court Should Award First National $364,615.95 in Expert-Witness Fees.**

FRIT knew that First National would have to retain experts to prove the matters it denied in its responses to RFA Nos. 1–7 and 10–11.  FRIT specifically objected to Nos. 1–7 and 10–11, expressly relying on an expert opinion from 2005 and taking the position that responding would require additional expert opinions.  As the plaintiff, First National bore the burden of proof at the damages trial.  With FRIT seemingly relying extensively on expert testimony, First National had no choice but to have its own experts incur substantial expenses in the damages phase.

This is a situation fully justifying an award of expert expenses.  In *House*, for example, the plaintiff was injured when a Giant employee drove a Giant food truck through a red light.  *Id.* at 258.  The plaintiff served RFAs that sought, among other things, an admission that "his medical bills were . . . causally connected to the accident."  *Id.*  The defendant responded, in pertinent part, "[w]hether plaintiff's medical bills were incurred as a proximate result of the collision is likely to be the subject of expert testimony and Giant of Maryland, LLC has not yet decided whether to have an expert review the medical bills to determine proximate cause."  *Id.* at 261 (brackets in original).  The court held:  "As this answer suggests, plaintiff would have been foolish to attempt to prove such substantial parts of his *prima facie* case without the benefit of expert testimony."  *Id.*  Similarly here, FRIT relied on an expert opinion in denying the RFAs, and with FRIT already having retained an expert who opined that the fair market value of the property was between $9.5 and $13.11 million and indicating that more expert testimony was to come, First National had no choice but to have its

-20-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

experts incur expenses to allow First National to meet its burden of proof.  But for FRIT's improper failure to admit the requested matters and but for FRIT's expert's erroneous method dictated by FRIT, First National would not have needed to incur further expert fees for the damages phase or would have been able to greatly limit the scope and cost of their work.

First National's request for expenses incurred in using expert witnesses during this limited period of time is reasonable, especially since First National is not seeking expert fees prior to November 1, 2007, the date by which it should have been very clear to FRIT that it needed to supplement its responses to admit the requests for admissions at issue.  In addition, the subject matter designated for the experts directly relates to the matters FRIT denied.  For example, one matter put at issue by FRIT's denials was the market value of the subject property as of May 11, 2001 — and FRIT expressly relied on the 2005 expert report by Mr. Hulberg in its denial.  First National retained its own appraiser — Neil A. Lefmann, MAI, SRA — to evaluate Mr. Hulberg's opinion and to offer an additional opinion about the proper appraisal of the property.  (Ryan Decl., ¶ 41.)  First National also retained an expert to opine on rent damages, put damages, and interest — Greg Regan.  In addition, First National retained two rebuttal witnesses.  (*Id.*)  One was Drew R. Arvay, who opined on the market value of the property as of May 11, 2001, and the other was Edward Collantes, who was designated as a rebuttal witness because FRIT stated that Hulberg's trial testimony would challenge First National's calculation the square footage of the property, which was an issue that could impact value.  (*Id.*)  Ultimately, Hulberg did not address the square footage of the property at trial and so First National did not need to call Mr. Collantes.  And finally, First National incurred expert-witness expenses in deposing FRIT's designated experts:  Mr. Hulberg (FRIT's appraiser), Mr. Meyer (FRIT's economist), and John Wallace (who testified about rent damages at his deposition but whom FRIT did not call at trial).  (*Id.*)

As of the date of this motion, FRIT has paid all of the expert-witness fees invoices (Ryan Decl., ¶ 42), which will be paid by the time this motion is heard.  Therefore, the Court should award First National expert-witness costs of:  $364,615.95.

-21-

**G.      FRIT Should Reimburse First National for Other Expenses Incurred in Proving the Truth of the Responses that Were Denied.**

First National submitted its Bill of Costs on July 6, 2009.  (DE 720.)  A number of the expenses itemized in the Bill of Costs were incurred after November 1, 2007.  If the Clerk of the Court finds that any of these fees do not fit within the technical requirements of Rule 54, First National asks that the Court award such costs under Rule 37(c)(2).

Further, there are a number of costs that First National cannot recover under Rule 54 or Local Rule 54-3.  (Ryan Decl., ¶¶ 43–47.)  For example, court reporter fees for the Phase II trial are not awardable except as part of costs for preparing the appellate record (or for other reasons not relevant here).  (L.R. 54-3(b).)  Court reporter fees to transcribe Phase II were necessary costs to prove the truth of FRIT's denials of the RFAs related to damages in that the parties had to submit papers, quoting the transcript, in support of papers related to the Findings of Fact and Conclusions of Law.  Accordingly, First National seeks $10,463.75 in expenses for those costs.  (Ryan Decl., ¶ 46.)  First National also seeks $7,960.82 incurred in hotel costs for its four core time-keepers during the week of trial.  (*Id.*, ¶ 45.)  These too are costs that First National cannot recover under Rule 54 or Local Rule 54-3, but were only incurred because of FRIT's failure to admit the RFAs in question.

In addition, the Court should permit First National to recover costs associated with depositions that are unavailable under Rule 54, but are appropriately awarded under Rule 37.  For example, after Magistrate Judge Seeborg ordered the deposition of Mr. Wood to proceed, FRIT insisted that the deposition proceed in Maryland.  (*Id.*, ¶ 44.)  Thus, First National's expenses incurred traveling to Maryland in the amount of $2,129.12, should be awarded.  (*Id.*)  As noted above, Mr. Wood's deposition testimony was used during the Phase II trial.  Indeed, First National is using his deposition admissions about the inappropriateness of Mr. Hulberg's methodology (dictated by FRIT's counsel) in support of this motion.  First National incurred additional expenses not recoverable under Rule 54 or Local Rule 54-3 as to the deposition of FRIT's former officer, Nathan Fishkin.  (*Id.*)  Mr. Fishkin would not travel to California from Washington, D.C. unless First National paid all of his expenses, including first class airfare, hotel, and meals.  (*Id.*)  First National did so, incurring expenses of $2,867.79.  (*Id.*)  Though Mr. Fishkin's trip was expensive, it would

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

-22-

have been far more expensive for Mr. Ryan to travel to Washington D.C. to take the deposition. When air-travel, time to travel and wait in airports, is taken into account, it would have cost First National at least $7,120 to have Mr. Ryan travel to take the deposition (excluding time actually taking the deposition).  (*Id.*)  Thus, in light of these facts, the Court should permit First National to recover $2,867.79 in expenses from FRIT for Mr. Fishkin's expenses.  (*Id.*)  In total, the expenses First National seeks total:  $23,421.48.

## IV.    CONCLUSION

First National served FRIT with RFAs that were designed to end the case and avoid the Phase II trial, or at least to streamline the case by addressing the key issues in Phase II — whether FRIT's conduct damaged First National (RFA No. 1), the amount of damages First National incurred (RFA Nos. 2–7), the fair market value of the property on the date of the breach (RFA Nos. 10–11), and the start date of the lease (RFA No. 13).  There is no doubt that FRIT's refusal to admit key matters at issue in Phase II required First National to incur substantial expenses in proving the matters FRIT refused to admit and prevented the case from being ended much earlier.  Because FRIT unreasonably denied each of the pivotal RFAs discussed above, FRIT forced First National to try all of these issues and to incur substantial expenses in so doing.  As a result, First National had to spend at least $1,544,774.50 in attorney's fees, $364,615.95  in expert-witness fees, and $23,421.48. in costs that it otherwise would have not have had to spend.  Therefore, the Court should shift the burden of these expenses to FRIT under Rule 37(c)(2) in the total amount of $1,932,811.93.

Dated:  July 9, 2009                                                    Respectfully submitted,

                                                                              WINSTON & STRAWN LLP


                                                          By    */s/ Patrick M. Ryan*
                                                                        PATRICK M. RYAN
                                                                        Attorneys for Plaintiff
                                                          FIRST NATIONAL MORTGAGE COMPANY

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

-23-